**In re 8315 FOURTH AVENUE CORPORATION, Debtor.**

**Bankruptcy No. 191–15729–260 (CBD).**

United States Bankruptcy Court, E.D. New York.

Sept. 22, 1994.

*Holland America.*

Kirschenbaum & Kirschenbaum by Samuel Kirschenbaum, Garden City, NY, for debtor.

Corash & Hollender by Paul Hollender, Staten Island, NY, for debtor.

Kramer, Levin, Naftalis, Nessen, Kamin & Frankel by Mark Chass, New York City, for Maxwell M. Rabb, receiver for Clinton Capital Corp.

Office of U.S. Trustee by Douglas E. Spelfogel, Garden City, NY.

## DECISION AND ORDER DENYING CONFIRMATION OF DEBTOR'S PLAN

CONRAD B. DUBERSTEIN, Chief Judge.

This cause was heard before the Court on Confirmation of the Debtor's plan of reorganization to which objections were filed by the Debtor's largest secured creditor. The Court, having reviewed the submission of documents and exhibits, the testimony of witnesses, and the argument of counsel, makes the following findings of fact and conclusions of law. For the reasons stated herein, the Court sustains the objections to confirmation, by reason of which fact confirmation of the Debtor's plan is denied.

## BACKGROUND

The Debtor owns and operates its single asset, the Hotel Gregory ("Hotel"), a four-story structure housing some sixty-four rooms, in the Bay Ridge section of Brooklyn. The Debtor's stock is owned in equal shares by Glenn R. Bergstol, Frank J. Picciolo, Frank W. Picciolo, Joseph Picciolo, Salvatore Picciolo, Thomas Picciolo, and Anthony Settecase ("the Picciolos"). Joseph Picciolo, the President of the Debtor, is an energetic octogenarian who together with his family, has been in the construction business for many years.

Prior to October 13, 1989, the Hotel was owned and operated by Cofmeg Realty Corporation ("Cofmeg"). A devastating fire nearly destroyed it in 1983. Joseph Picciolo headed a construction project called in to rebuild the Hotel. In addition to the fire, the Hotel was plagued with mismanagement and general failure to attract clientele with sufficient means. When Cofmeg could no longer fund the restoration work, the Picciolos interceded and caused the formation of the 8315 Fourth Avenue Corporation, the Debtor herein, which then purchased the Hotel in October of 1989.

The Debtor was well aware that the Hotel came at an extraordinary price. Its purchase price was about $8,000,000, comprised of its assumption of the existing mortgages arising out of loans to Cofmeg in excess of $5,000,000, and a purchase money mortgage of about $3,000,000. In addition, the Picciolos paid $250,000 upon closing. It has been noted that the Hotel was completely fire gutted and vacant when it was purchased by the Debtor it in 1989.

The Debtor immediately set forth to transform the dilapidated structure into an attractive Hotel which has come to be known as the "Jewel of Bay Ridge." In order to effectuate restoration it was necessary for the Picciolos to address the Hotel's two most pressing problems, namely, the necessity for a significant infusion of new capital, together with the dire need for structural repairs. In total, the Picciolos personally invested, prepetition, approximately $1,600,000 in the Hotel, raising such funds by, among other things, offering second mortgages on their

respective homes. Furthermore, the Picciolos, who, as previously mentioned, were in the contracting business, personally performed many of the Hotel's necessary repairs. The sum total of their efforts resulted in its transformation from a burned out hulk to the attractive Hotel it is today.

While the family managed to repay, prepetition, approximately $873,829 in regular monthly payments to secured creditors, it was soon deemed impossible to keep current with such mortgage obligations. The Debtor's inability to keep up with the mortgage payments, in conjunction with the threat of an imminent real estate tax foreclosure, prompted the Debtor to file the instant Chapter 11 petition for relief on August 22, 1991.

At a hearing held on May 4, 1992, upon the application of Maxwell M. Rabb, as Receiver for Clinton Capital Corporation ("Clinton"), the holder of the second and third mortgages affecting the premises, the Court directed the Debtor to make adequate protection payments to it. Accordingly, the Debtor paid $10,000 into an escrow account for Clinton on three separate occasions, the first in June of 1992, the second in September of 1992 and the third in October of 1992. Thereafter the escrow account was paid over to Clinton, and the Debtor was directed to pay an additional $30,000 into the account, which it did in September of 1993. The Court thereafter directed the Debtor to pay an additional $25,462 into the escrow account which the Debtor did in October of 1993.

### THE VALUATION OF THE HOTEL

On June 30, 1993 and again on July 9, 1993, this Court held hearings to fix the Hotel's value in order to determine the status of the mortgage claims, as well as the confirmability of such plan as would be proposed in the future. Appraisals had been previously performed in October of 1992 by William

R. Beckmann of Beckmann Associates, on behalf of the Debtor, and in March of 1993 by Arthur Siegel of Becker, Ruben & Associates, Inc., on behalf of Clinton, both of who qualified as experts. Although they agreed that the appropriate method for appraising the Hotel was based on income capitalization[1] and utilized that method in their respective appraisals, the Debtor's appraiser valued the Hotel at $3,300,000, and Clinton's appraiser valued it at $4,860,000. The results differed simply because each appraiser utilized different projected occupancy rates for the Hotel. In the interest of judicial economy, and with the consent of the parties, this Court determined the value of the Hotel to be $4,080,000, representing the amount equidistant between the differing appraisals.

Since filing the Chapter 11 petition, the Debtor has proposed four plans of reorganization, augmented by four Modifications to the Fourth Amended Plan (denominated, for obvious reasons as the "Final Plan"), which it filed on November 11, 1993. For the purposes of this opinion the Final Plan is hereinafter as referred to as the "Plan." The hearing on the confirmation of the Plan was held on November 29, 1993. In light of the objections filed by Clinton as hereinafter set forth, this Court reserved its decision on whether or not the Plan should be confirmed.

### THE PLAN

The Debtor's Plan separates its creditors into six classes, all of which are impaired[2] and are identified and treated in the Plan as follows:

*Class 1:* **The City of New York** ("City") is the only member of this Class, with a fully secured claim in the amount of $223,422.71 consisting of pre-petition liens for allowed real property taxes, water and sewer charges. The Plan contemplates full payment to the City over a period of five years

---

1. In order to appraise property by the income capitalization method, Beckmann and Siegel subtracted the property's expenses from the property's income to determine the Hotel's net operating income. They then multiplied the net operating income by an appropriate capitalization rate to determine the value of the property.

2. Section 1124(1) of the Bankruptcy Code generally provides that a claim is impaired if the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest is altered in any way.

All sections refer to the Bankruptcy Code 11 U.S.C. § 101 *et seq.,* unless the context otherwise indicates.

in monthly installment payments of $5,650 per month in the first year, and $6,059 per month in the second through the fifth year. The City has agreed to a reduction in interest accruing on its claim commencing upon confirmation of the Plan from the current statutory rate of 18% to the rate of 14% as provided for by the Plan. Although the City originally filed a secured proof of claim for $614,818.73, recent negotiations between the City and the Debtor resulted in a mutual agreement reducing its claim to $223,422.71 as set forth above, inclusive of 18% interest up to the date of the filing of the petition for Chapter 11 relief. Thus, the City's claim is impaired.

*Class 2:* **Jerome and Gilbert Spitzer** ("the Spitzers") are the only members of this Class, in their capacity as the current holders of a first mortgage on the Hotel, with a fully secured claim in the sum of about $793,000. The Plan provides for full payment of this claim.

The mortgage is a building loan mortgage originally made by the Dime Savings Bank (the "Dime") to Cofmeg for $1,500,000 which provided for "interest only" payments monthly, until the full $1,500,000 had been made available to Cofmeg. The Dime was to enter into a permanent loan with Cofmeg, and the repayment terms of the loan were to be incorporated into a permanent loan. It is unclear as to whether the Dime extended the permanent mortgage loan.

The mortgage was assigned to Stockbridge Funding Corp. ("Stockbridge") prior to the commencement of this Chapter 11 case. During the course of this case, Stockbridge assigned the mortgage to the Spitzers.

Upon confirmation, the mortgage's current contractual rate of interest is to be reduced. The loan is to be fully payable by 1999, the fifth and generally, the final year of the Plan. It provides that interest which accrues post-petition will be added to the loan's principal upon confirmation. Throughout the Plan's five year pendency, it is contemplated that the Debtor will make fixed monthly payments of $8,038 to the Spitzers. A balloon payment of $776,593 is required at the end of 1999 to provide the loan's full satisfaction. Thus, Spitzers' claim is impaired.

*Class 3:* **Clinton Capital Corporation** ("Clinton") is the only member of this Class in its capacity as the holder of a second mortgage on the Hotel, with a fully secured claim for about $1,800,000, plus post-petition interest and legal fees. The Plan provides that payment of this mortgage, otherwise fully due and payable in 1996, is extended to 1999. Upon confirmation, its interest rate is to be reduced from its contractual rate of 15.75% to 13%. It further provides that the interest, which is estimated to total approximately $372,900 by the date of the confirmation of the Plan will be added to the loan's principal, and its payment deferred until 1999. At that time that sum will have accrued approximately $242,385 in interest. At the end of 1999 the Debtor will make a balloon payment of about $615,285 in satisfaction of the post-petition, pre-confirmation interest and the interest that accumulates on that interest throughout the fifth year pendency of the Plan. Monthly payments to Clinton of $14,662, commencing 30 days from confirmation will necessitate the Debtor making another balloon payment of approximately $819,430 to fully satisfy the loan. Thus, Clinton's second mortgage claim is impaired.

*Class 4:* As the holder of a third mortgage, Clinton is the only member of this Class. The amount due under the mortgage is approximately $2,194,714. After deducting the total amount of the claims of the lienors who are senior to this third mortgage from the Hotel's value of $4,080,000, the equity remaining will amount to approximately $1,674,600. Pursuant to section 506(a), that sum is fixed as the amount of Clinton's secured third mortgage claim, and the balance due it in the sum of approximately $520,100 is allowed as its unsecured claim provided for by Class 5 hereinafter set forth.

The Plan provides for the negative amortization of this Class 4 secured claim. The mortgage, which carries a contract interest rate of 15.875% was fully due and payable in a balloon payment on July 1, 1992, prior to the Debtor's filing of its petition in bankruptcy. The Plan, however, extends the loan's due date until 1999, and modifies the interest rate to 14% upon confirmation. It also pro-

poses fixed payments to be made on account of the secured claim at the rate of $10,800 per month in the first year, $11,800 per month in the second year and $13,300 per month in the third through the fifth year of the Plan. Negative amortization occurs inasmuch as each fixed monthly payment is applied only to interest. As a result, each payment satisfies only a portion, that is, about 50%, of the accrued interest for each month. The remaining unsatisfied interest is capitalized by being added to the loan's remaining principal. Consequently, such unpaid interest accrues interest along with the loan's unpaid principal. Thus, the proposed fixed monthly payments, applied solely to interest, are of an amount less than the interest actually accruing each month throughout the five year pendency of the Plan. The implications of such negative amortization is one of the objections to the Plan interposed by Clinton as hereinafter set forth in this opinion. Finally, the loan requires a balloon payment of approximately $2,310,500 at the end of 1999. By reason of all of the foregoing, Clinton's claim in this Class is impaired.

*Class 5:* This Class is comprised of the holders of allowed general unsecured claims amounting to approximately $9,000,000. This sum includes an amount in excess of $8,000,000, representing the undersecured claims of mortgagees whose claims are thus unsecured, in approximate amounts set forth below:

| | | |
|---|---|---|
| Clinton Capital Corp. | — | $ 520,100 |
| Mr. Ables, Inc. | — | 2,900,000 |
| Mannie Corman | — | 176,000 |
| Olympian Mortgage Corp. | — | 435,000 |
| Stockbridge Funding Corp. | — | 2,200,000 |
| Cofmeg Realty | — | 2,600,000 |

The remaining amount in excess of $1,000,000 consists of the general unsecured claims of approximately 34 creditors.

The Plan provides for this Class to receive a payment of 30% on account of their claims over a ten year period with no interest. They will initially participate pro rata in a $25,000 payment made by the equity holders upon confirmation of the Plan, as well as a pro rata share of monthly payments to be made by the Debtor throughout the ten years subsequent to confirmation. The unpaid balance of the 30% remaining shall be-

come due and payable without interest, ten years from the confirmation date of the Plan or upon such earlier sale or refinancing of the Hotel, if any. Thus, this Class is impaired.

*Class 6:* This Class is comprised of the shareholders of the Debtor. The Plan provides that they will retain their stock interests in exchange for new value contributions which generally consist of a cash payment of $25,000 and a host of other contributions of labor, maintenance and personal guarantees, more particularly set forth in an Affidavit of New Value dated December 16, 1993, hereinafter discussed in this opinion. The Debtor claims that viewed as a whole, the new value contributions the shareholders propose to make are equal to or exceed the value of the stock they propose to retain.

### BALLOON PAYMENTS

As indicated above, the Plan requires substantially large balloon payments totalling nearly $5,000,000 to the priority and secured Classes at the end of the fifth year of the Plan. In the event the Hotel is sold or refinanced, an additional balloon payment of approximately $2,465,000 must be paid to the unsecured creditors in Class 5.

### THE VOTE ON THE PLAN

As has been noted, all Classes of creditors contemplated by the Debtor's Plan are impaired. All Classes except for Class 1, the City of New York, have voted to reject the Plan.

Class 2, which consisted of Stockbridge's mortgage claim, originally voted to accept the Plan but on August 5, 1994, after the claim had been assigned to the Spitzers, this Court entered an order permitting them to withdraw their acceptance of the Plan, and changed their vote to a rejection of the Plan, pursuant to their request.

At the time of voting, it was unclear as to whether the Spitzers or Stockbridge was the holder of the first mortgage on the Hotel. To avoid delay, the Debtor solicited votes from both of them, both of which voted to accept the Plan. On June 30, 1994, at a hearing held by this Court, the Spitzers rep-

resented that Honorable Frank Conrad, Bankruptcy Judge sitting in the Chapter 11 proceedings of Stockbridge in the Southern District of New York approved a settlement which provided that the Spitzers are, in fact, the undisputed holders of the first mortgage. An order to that effect entered by Judge Conrad was duly filed in this case.

On June 9, 1994, the City of New York, the Class 1 creditor, made known to this Court, the Debtor and the major secured creditors that its previous acceptance of the Plan would be withdrawn if the Debtor failed to pay its claim for post-petition taxes for real estate, related charges and interest, all amounting to approximately $295,200. Thereupon the City moved this Court for an order compelling the Debtor to pay the claim immediately pursuant to section 503(a),[3] or in the alternative, lifting the automatic stay to permit it to perfect a lien on the Hotel's property for the amount due pursuant to local law or dismissing the case.

The City's motion was heard on June 23, 1994. Although appalled at the Debtor's post-petition conduct in failing to pay its post-petition taxes, this Court granted the Debtor an adjournment of one week with the understanding that if the taxes were not paid, the Court would undoubtedly grant the City's motion. At the subsequent hearing on June 30, 1994 the Debtor represented that it paid the City the full amount due it by bank check for $123,210 which the Debtor stated came out of funds held in escrow by it for the payment of taxes and a check for the balance due of approximately $172,000 drawn on the Debtor's tax account. The City thereupon withdrew its motion. As a result it is the sole impaired Class which has accepted the Plan.

### FACTS REGARDING THE FEASIBILITY OF THE PLAN

During the course of the many hearings before this Court the Debtor sought to establish that the Hotel's future operations would be profitable enough to meet the payments that it intends to pay the creditors under the terms of the Plan. Extended testimony was taken of the Debtor's bookkeeper, accountant, and office manager, based upon which the Debtor prepared a projection which set forth the Debtor's income and expenses for the five year period covered by the Plan, and which was intended to demonstrate that there would be sufficient funds available from the Debtor's operations to meet the payments under the Plan.

The projection reflected the net operating income and Plan payments required by the Plan through the fifth year as follows:

| PERIOD | NET ANNUAL OPERATING INCOME | PLAN PAYMENTS Monthly | TO CREDITORS Annually |
|---|---|---|---|
| First Year | $ 610,022 | $ 44,650 | $ 535,800 |
| Second Year | 684,260 | 46,559 | 558,708 |
| Third Year | 774,456 | 48,559 | 582,708 |
| Fourth Year | 844,500 | 48,559 | 582,708 |
| Fifth Year | 918,491 | 48,559 | 582,708 |
| TOTALS | $3,831,729 | | $2,842,632 |

Recapitulation:

| | |
|---|---|
| Total Operating Income | $3,831,729 |
| Total Payments to Creditors | 2,842,632 |
| Surplus | $ 989,097 |

---

3. Section 503 provides in pertinent part as follows: Allowance of administrative expenses.

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

. . . . .

(1)(B) any tax—

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title. . . .

Although the projected expenses included an amount for repairs and maintenance which was estimated at about $50,000, Mr. Joseph Picciolo asserted that the Picciolo family intended to make the bulk of the repairs themselves. Consequently, eliminating the sums earmarked for repairs which the Debtor really did not intend to pay for as stated by Mr. Picciolo, the projected amount available for payment to the creditors would be increased by the savings effected. This was completely overlooked under the projections.

### THE OPERATING REPORTS

Although at one of the hearings before this Court at which time the projections were finally formulated and analyzed by this Court, it believed and stated that the Debtor's Plan was feasible. In the months that followed, the Debtor failed to file monthly operating reports (the "Reports") required by section 1106, Bankruptcy Rule 2015 of the Federal Rules of Bankruptcy Procedure, Local Rule 19 of this Court, and the United States Trustee Operating Guidelines. On June 20, 1994, although considerably late, the Debtor filed its report of operations for the 6 months of December, 1993 through and including March, 1994. Upon examining the Reports, the United States Trustee (the "Trustee") assigned to this case indicated to this Court that they failed to include:

(i)   a balance sheet;

(ii)  supporting schedules to the statement of operations;

(iii) a statement of cash flow;

(iv)  a statement of cash receipts and disbursements for the operating account and tax trust account;

(v)   a summary of post-petition tax and administrative expense liabilities;

(vi)  a summary aging of pre and post-petition accounts payable;

(vii) a summary aging of pre and post-petition accounts receivable;

(viii) a detailed schedule of all taxes collected and incurred, and a schedule

of all remittances made on such taxes.

The Trustee thereupon moved this Court for an order converting this case to one under Chapter 7 or in the alternative, dismissing it, pursuant to section 1112(b), which motion is presently pending before this Court.

The Trustee contends that the Debtor's operations failed to live up to the monthly profits as set forth in the projections. He notes that although the Debtor's net income for the 6 months amounted to approximately $211,000, the Reports do not reflect the accrued debt service payments of approximately $250,000 due for the period. The projections indicate fixed debt service payments of $510,000 in the first year, thus $255,000 is estimated as the required sum to be paid during the first six month period. The Trustee therefore argues that had the Plan been confirmed prior to October of 1993, not only would the Debtor have failed to realize any net income over that six month period, but it would have fallen at least $44,000 in arrears. This arrearage contradicts the Debtor's projections which estimated a net income for the six month period of about $50,000 after payment of debt service required by the Plan. The Debtor's own figures in its Reports support the Trustee's assertion that the projections are "erroneous and visionary."

The Trustee also emphasized that during the six month period, the Debtor projected that it would accrue approximately $75,000 in real estate taxes based upon its estimate of $150,000 required for the same, yet the Reports do not reflect them as a paid expense. If the Debtor had in fact paid the $75,000 for real estate taxes and had it made its debt service payments of $255,000 in the six month period, it would have sustained a net loss of $100,000. If this trend was to continue, the Debtor would lose $200,000 each year, and at the end of the fifth year, it would have sustained a loss of at nearly $1,000,000 at a time when balloon payments of nearly $5,000,000 would be due. These computations take into account the $600,000 in professional fees that have been requested which will be sought by attorneys and accountants in this case as set forth in the Disclosure Statement. The projections also include a

substantial source of income which it had anticipated from the operation of the restaurant in the Hotel. The Reports do not reflect the same.

Recognizing that the Debtor might be unable to meet the projections, the Plan includes a fall-back position when it provides that, if required, within five years from the closing date, the Debtor shall, by refinance, sale or other means, obtain the funds necessary for it to pay all administrative expense claims and allowed secured claims, that is, the Classes composed of 1 through 4, and that similar treatment for the unsecured Class 5 creditors would likewise be provided to pay them the balances due them on account of the 30% of the allowed amount of their claims.

## THE OBJECTIONS TO THE CONFIRMATION OF THE PLAN

Clinton, the Debtor's largest creditor, has filed significant objections to the confirmation of the Plan as follows:

1. It is not feasible and thus not confirmable pursuant to section 1129(a)(11).[4]

2. It is not fair and equitable because it improperly attempts to "cram down" Clinton's secured claims by negative amortization in violation of section 1129(b)(2)(A)(i)(II).[5]

3. It violates the "absolute priority rule" inasmuch as it provides for the retention of the equity security holder's ownership interest in the Debtor while failing to provide the dissenting creditors the consideration to which they are entitled, in violation of section 1129(b)(2)(B)(ii).[6]

4. Section 1129(a)(11) of the Code provides:
   (a) The court shall confirm a plan only if ...
   (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

5. Section 1129(b)(2) defines "fair and equitable" in relation to the treatment of claims in a chapter 11 reorganization plan.
   Section 1129(b)(2)(A)(i)(II) provides that a plan is fair and equitable with respect to a class of

## GENERAL DISCUSSION

This Court is faced with a decision in which it must weigh serious equities, act justly, be compassionate, yet do so never losing sight of the statutory mandates and intent of Congress. It recognizes the hard work, commitment and toilings of the Picciolos both prior to and after the filing of this Chapter 11 case, and their sincere desire to continue operating their very unique and beautiful Hotel in Brooklyn. However, the Court cannot overlook the fact that the Hotel is saddled with tremendous debt which far exceeds its market value, adverse financial conditions which apparently will create difficulties in the Debtor's efforts to make payments to the creditors as provided for by the Plan, and its inability to comply with the standards required by section 1129 of the Code.

This Court is aware of the plight of the mortgagees who had faith in the Hotel, many of whose prayers were answered only by having their claims impaired, while others are classified as undersecured to be lost in a sea of unsecured creditors. It is abundantly clear that they have no faith in the Debtor's ability to consummate its Plan and thus all of the mortgagees have rejected the Plan. The unsecured creditors, by their similar vote of rejection, have sent a message to this Court that they would prefer nothing rather than to accept a Plan that provides a payout of a minimal amount over a ten year period. The Spitzers, as holders of the fully secured first mortgage, changed their vote of acceptance to rejection not only because the Debtor failed to timely pay its taxes, but as was stated by Mr. Spitzer on the record, he is convinced that the Debtor cannot fulfill its payment schedule. Clinton, the fully secured

secured claims if, *inter alia:* each holder of a claim of such class receives on account of such claim, deferred cash payments totalling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates's interest in such property.

6. The "absolute priority rule", codified in section 1129(b)(2)(B)(ii), provides as follows: "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

second mortgagee and undersecured third mortgagee, has filed extensive objections to the Debtor's Plan. One of the undersecured creditors, Mr. Ables, Inc., by letter from its counsel, expressed its full support of Clinton's objections.

Finally, as discussed in detail below, the only Class that accepted the Plan is the City of New York, whose claim consists of only non-consensual liens which arose pre-petition as a result of unpaid real property taxes and related charges.

### FEASIBILITY DISCUSSION

■ Section 1129(a)(11) provides that the Court shall confirm a plan only if:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor ... unless such liquidation or reorganization is proposed in the plan.

Thus, anticipating difficulty in meeting its projections, the Plan specifically provides, in pertinent part, as follows:

7.6 Within five years from the Closing Date, the Debtor shall, by refinance, sale or other means, obtain the funds necessary to pay all Administrative Expense Claims and Allowed Secured Claims (Classes 1–4).

The Debtor proposes similar treatment for Class 5 creditors, inasmuch as the Plan provides, in pertinent part:

7.7 Within ten years from the Closing Date, the Debtor shall, by refinance, sale, or otherwise, obtain the funds necessary to pay the Holders of Allowed Class 5 Claims the balance due on account of 30% of the Allowed amount of such claims.

■ In order to confirm the Plan the Court must find that it is feasible. The feasibility test set forth in section 1129(a)(11) requires us to determine independently whether the Plan is workable and has a reasonable likelihood of success. *In re Drexel Burnham Lambert Group*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992).

In determining whether the Plan is feasible in this case, the Court must consider if there is a reasonable likelihood the Debtor can and will meet its financial obligations pursuant to the Plan.

The Debtor asserts that at the end of the fifth year of the Plan there will be sufficient equity in the Hotel as a result of its sale or arising out of refinancing, if such course of action is needed, in order to satisfy the balloon payments it will require at that time, relying on the testimony of its appraiser, William Beckmann. He testified that the value of the Hotel at the end of the fifth year would be more than sufficient to support a loan capable of paying all the required balloon payments totalling nearly $5,000,000. It was his testimony that if the projections are met, the Hotel would be able to obtain a mortgage in excess of $5,000,000 based on the projected cash flow of $1,000,000 representing the net operating income at the end of the fifth year. Mr. Beckmann's testimony is inconsistent with his testimony adduced during cross examination. At that time he testified that the Debtor could presently procure mortgage financing for only up to 65% of the total appraised value. (*See* transcript of June 30, 1993 at p. 55). Utilizing Mr. Beckmann's formula, in order for the Debtor to refinance balloon payments in excess of $5,000,000 due in five years, the Hotel would have to be worth more than $8.3 million dollars. Thus, the Hotel would have to more than double in value over the next five years, which is equivalent to a 20% appreciation each year. The Debtor's projections themselves fail to support such an unlikely occurrence. Moreover, Mr. Beckmann offered no testimony regarding the Debtor's ability to obtain a mortgage in five years at which time more than $2.7 million in junior mortgages would also be encumbering the Hotel. Clinton's appraiser, Mr. Siegel, considered those junior mortgages and concluded that the Debtor could borrow $5,000,000 in five years only if the Hotel were worth $11.7 million— almost a 200% increase in the present value of the Hotel. (*See* June 30, 1993 transcript at pp. 137–9). Accordingly, even though the Plan provides for a sale or refinancing, thus coming within section 1129(a)(11), such sale or refinancing are clearly not feasible.

This Court agrees with Mr. Siegel's assertion regarding the conservative lending prac-

tices of mortgagees and that the $2.7 million in existing liens adversely affect any refinancing arrangement. This Court doubts that in the event of a refinancing in the fifth year, the $2.7 million in existing liens would agree to be subordinated to any refinanced loans as anticipated by the Plan. It is unlikely that any potential mortgagee would offer refinancing unless it would be provided senior lien status. Thus, to obtain sufficient refinancing at the fifth year, the current value of the Hotel, $4,080,000, would have to skyrocket by a sum of about $7,000,000 to reach the $11.7 million estimated to be required to accomplish the refinancing.

It is apparent that insofar as it believes a sale of the property or its refinancing will enable it to carry out the Plan, the Debtor is relying on a:

> veritable pot of gold at the end of the rainbow.... Plans which extensively rely on the sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where the asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions of the underlying plan.

*In re Investors Fla. Aggressive Growth Fund, Ltd.,* 168 B.R. 760, 765 (Bankr. N.D.Fla.1994).

■ As has been previously stated at the confirmation hearing held some time ago, this Court found that the Debtor's Plan of Reorganization was feasible as submitted. It based its decision upon the testimony given at the hearing prior to and on the confirmation hearing date, as well as on the projections developed and testified to at the hearings. However, in determining the feasibility of a Plan, the Court must "scrutinize" it carefully. *See In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988).

■ A bankruptcy court may postpone a decision on confirmation of a Debtor's Plan to test the Plan's projections. *See In re Belco Vending, Inc.,* 67 B.R. 234, 238 (Bankr. D.Mass.1986). Throughout the pendency of the instant reserved decision on the confirmation of the Debtor's Plan, this Court was afforded the opportunity to revisit its decision on feasibility. The purpose of the feasibility requirement under section 1129(a)(11) is to avoid the confirmation of plans with "visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation.... Where the financial realities do not support the proposed plan's projections, or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *Investors Fla. Agressive Growth Fund, Ltd.,* 168 B.R. at 765. *See also In re Lakeside Global II, Ltd.,* 116 B.R. 499 (Bankr.S.D.Tex.1989).

■ The Debtor bears the burden of proving confirmation by a preponderance of the evidence. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter. Ltd., II (In re Briscoe Enter., Ltd.),* 994 F.2d 1160 (5th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). In reviewing a bankruptcy court's confirmation of a single asset Debtor's plan of reorganization, the 5th Circuit concluded that because confirmation involves only financial issues, the preponderance of the evidence standard is appropriate. *Id.* at 994 F.2d 1165. This Court adopts that evidence standard in this case. In light of the history of the Debtor's operations, which reveal its inability to meet its projections and the insurmountable problems it would face in selling the Hotel or refinancing it to meet the Plan's payment provisions, this Court finds that the Debtor has failed to demonstrate the feasibility of the Plan as required under section 1129(11) by a preponderance of the evidence. Accordingly, confirmation of the Plan must be denied.

## CLINTON'S OBJECTION THAT THE PLAN IS NOT FAIR AND EQUITABLE AND THE CRAM DOWN PROVISIONS OF SECTION 1129(b) SHOULD NOT BE PERMITTED

■ Section 1129(b), colloquially known as the "cram down" provision, "allow[s] a plan proponent to obtain plan confirmation despite nonacceptance by one or more impaired classes." *See* 6 James F. Queenan, Jr. et al.,

*Chapter 11 Theory and Practice: A Guide to Reorganization* § 31.02, at 31:3 (1994).

As previously indicated, all classes of creditors are impaired under the Plan. Confirmation of a plan of reorganization requires *inter alia,* that when a class or classes of claims are impaired under the Plan, at least one impaired class has accepted the Plan. Section 1129(a)(10). This requirement has been met inasmuch as the City has accepted the Plan. Section 1129(b) requires that where an impaired class dissents, confirmation is only possible if the plan *inter alia* provides fair and equitable treatment for any dissenting class.

Clinton argues that the Plan improperly subjects its claims to negative amortization and unreasonable terms which are not fair and equitable, in violation of section 1129(b)(2)(A)(i)(II).[7] The Debtor argues that its proposed Plan complies with section 1129(b) with respect to Clinton's claims by reason of the fact that the Plan calls for it to retain its liens and receive deferred cash payments equal to the amount of its secured claims, and that negative amortization *per se* is no reason for barring confirmation.

Negative amortization refers to:

a provision where in part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue to be paid when income has presumably increased.

*In re Club Assocs.,* 107 B.R. 385, 398 (Bankr. N.D.Ga.1989).

■ Many courts do not invalidate negative amortization *per se* as proposed in a Chapter 11 plan. *See* 6 Queenan, *supra* p. 23, § 31.31 at 31:58, *citing Great W. Bank v. Sierra Woods Group,* 953 F.2d 1174 (9th Cir.1992); *Federal Sav. & Loan Ins. Corp. v. D & F Constr. Inc. (In re D & F Constr. Inc.),* 865 F.2d 673 (5th Cir.1989) (other citations omitted). Whether or not rejection is in order is determined by the degree of risk of the exposure created for the secured lender which is being required to enter in that position by the Plan. *Id.*

7.  Section 1129(b)(2)(A)(i)(II) *supra* note 5.

The Debtor claims that the Plan is fair and equitable in its treatment of Clinton's secured claims despite the negative amortization of such claims because (i) Clinton is receiving "a relatively high rate of interest"; (ii) Clinton's original loan documentation provided for negative amortization; and (iii) Clinton should be equitably estopped from asserting unfair or inequitable treatment. Analyzing all of the facts involved with respect to this issue, the Court finds that the Debtor's claims are unfounded.

The Debtor represents that one of the underlying causes of the negative amortization of Clinton's secured claims is the "Debtor's willingness to provide relatively high interest rates to Clinton to wit 13% for Class 3 and 14% for Class 4." Those rates, however, which emerged at the insistence of this Court, were found by this Court to be market rates at best. By negatively amortizing Clinton's claims, the Debtor is providing Clinton with significantly less than a market rate of interest since the Plan provides that the interest which accrues is not payable for five years. Thus, in fact, using a 14% discount rate, $1 paid in five years has a present value of less than $.52. Accordingly, the Plan is not fair and equitable to the extent that it does not provide Clinton with the market rate of interest in the long run, even though initially the Debtor reluctantly adopted the Court's direction as to the interest rate.

An examination of the lending agreements with respect to Clinton's secured claim reveals that the Debtor mischaracterizes Clinton's original loan documentation. In support of its contention, the Debtor notes that Clinton's second mortgage documents provide for negative amortization and contends that it is not unreasonable to "extend the risks contemplated by Clinton even if the terms differ from those provided for in the original note." However, the Debtor neglects to note how dramatically the Plan would alter the terms of the second mortgage. An examination of that mortgage's documentation reveals that it merely provides for a partial moratorium for interest payments for the first year with the require-

ment that at the end of that year all of the interest that accrued but was unpaid would become due immediately and the loan would become fully amortizing. The Plan, on the other hand, provides for a very significant amortization throughout the life of both of Clinton's mortgages. Pursuant to the Plan, the second mortgage of approximately $1,700,000 will accrue interest at 14%. Therefore, under Clinton's second mortgage monthly interest payments should aggregate more than $19,800. Instead, the Debtor proposes making monthly payments during the first year of only $10,800 which yields an effective interest payment of only 7.6%, well below the current market rate, according to the expert testimony of the Debtor's and Clinton's appraisers. It is to be noted that with respect to the terms of Clinton's first mortgage, it included no negative amortization.

The Debtor argues that Clinton should be equitably estopped from contending unfair or inequitable treatment, yet cites no case law or authority in support. It would appear that the Debtor argues that Clinton is somehow responsible for the Debtor's precarious financial condition and its bankruptcy filing. The Debtor's assertion that Clinton should be equitably estopped from objecting to the Plan is without merit and does not support the Debtor's effort to negatively amortize Clinton's claims. By reason thereof, negative amortization of these claims renders the Plan unfair and inequitable.

## CLINTON'S OBJECTION THAT THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE

Clinton argues that another ground for denying confirmation of the Plan is that it provides for the retention of ownership by the Debtor's shareholders of their equity interests while failing to provide full payment to the dissenting, unsecured creditors. Clinton contends that such provision is in violation of the absolute priority rule as reflected by the provisions of section 1129(b)(2)(B)(ii) which provides that the holder of any claim or interest that is junior to the claims of the senior Classes of creditors will not receive or retain under the Plan any property on account of their junior claims.

As has already been noted in the previous discussion relating to "cram down" provisions of a plan, in order for a debtor to confirm a cram down plan over a creditor's objection, the Plan must be fair and equitable with respect to its treatment of that creditor.

> [W]hile reducing the value of the creditor's interest, the statute prohibits any junior class of creditors or interest holders from receiving or retaining anything of value on account of their claims or interests.... Such a result would be neither fair nor equitable.

Michael J. Venditto, *The Implied Requirement of "Good Faith" Filing: Where are the Limits of Bad Faith?*, 1993 Det. C.L.Rev. 1591, n. 121 (1993) (*citing In re Holiday Assocs. Ltd. Partnership*, 139 B.R. 711, 716 (Bankr.S.D.Iowa, 1992)).

■ Although the authorities are split on recognizing "new value" contribution insofar as it affects the absolute priority rule, this Court is in support of it where the equity holders make a substantial contribution. It is the Debtor's contention that the "new value" which the holders provide and upon which the Plan relies, meets the requirement for substantial contribution, making provision for the following:

(a) collaterization of plan payments with stock pledge;

(b) cash payment of $25,000;

(c) personal guarantee of monthly plan payment;

(d) personal guarantee of payments for outside licensed labor and material costs necessary to obtain permanent Certificate of Occupancy;

(e) contribution of all non-licensed labor to complete work necessary to obtain permanent Certificate of Occupancy;

(f) contribution of labor for building maintenance and repair over the next five years; and

(g) personal guarantee of professional fees.

In addition to the foregoing, the shareholders would provide the unsecured creditors

with a $2.7 million mortgage on the Hotel, 50% of the net proceeds in the event of a sale of the Hotel to be provided to the class of unsecured creditors, and finally a waiver of any distribution or payment on account of the unsecured claims of the shareholders.

Clinton contends that the new value exception is not satisfied by the foregoing contributions offered by the shareholders for the following reasons:

### 1. The Shareholders Are Contributing No More Than $25,000 In New Value

It is clear that according to the mandate of the Supreme Court in its decision of *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), none of the contributions, other than $25,000 in cash can constitute new value because they are not money or money's worth. In *Ahlers,* the Supreme Court stated explicitly that new value must be a *present* contribution in money or money's worth to satisfy the new value exception. However, the Debtor claims that the labor to be contributed by the shareholders is distinguishable from the labor contributed in *Ahlers.*

The Debtor cites no case or other source to support its conclusion that the labor which the shareholders have offered to contribute differs from that in *Ahlers.* The Supreme Court stated clearly, as it had in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) *reh'g denied,* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939), that the promise of future services is not money or money's worth, and that such a promise "is intangible, inalienable, and in all likelihood, unenforceable. It has no place in the asset column of the balance sheet of the net [entity]." *Ahlers,* 485 U.S. at 204, 108 S.Ct. at 967. (Citation omitted). The Court went on to state that "[u]nlike 'money or money's worth', a promise of future services cannot be exchanged in any market for something of value to the creditors today." *Id.*

Courts have routinely held that even a promissory note issued by an "equity holder" is not money or money's worth because it is not a present contribution. *See e.g., In re Yasparro,* 100 B.R. 91 (Bankr.M.D.Fla.1989) (contribution of promissory notes is not new value because payments are made in the future). *See also In re Hendrix,* 131 B.R. 751 (Bankr.M.D.Fla.1991) (promise to make monthly payments to fund plan is future contribution and does not constitute money or monies worth); *In re Sovereign Group 1985–27 Ltd.,* 142 B.R. 702 (E.D.Pa.1992) (escrowing funds to secure guarantee of plan distributions held not to constitute new value). Thus, if a promissory note, or even escrow funds, which directly contribute capital to reorganize the debtor, are not considered money or money's worth, the promise of future labor certainly is not inasmuch as it fails to satisfy the new value exception.

It is to be noted that the unsecured creditors whose claims amount to in excess of $7,000,000 have objected vociferously to the Plan because it violates the absolute priority rule, inasmuch as the total amount they could receive even if the Plan were consummated is 30% of their claims without interest over ten years.

In a recent decision, the Ninth Circuit held that a "cram down" plan that proposed 100% payments to the unsecured creditors over sixty seven months without interest, was fatally defective because it did not compensate the unsecured creditors for the lost time value of their money, did not pay them in full, and therefore violated the absolute priority rule. *Everett v. Perez (In re Perez),* 30 F.3d 1209 (9th Cir.1994).

### 2. Guarantees

Personal guarantees, even when combined with cash contribution, do not constitute "new value." *See e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990) (a guarantee is not money or money's worth because it cannot be used as collateral, cannot be sold to raise money and cannot form the basis of satisfaction of a debt). *See also, Sovereign Group,* 142 B.R. at 702; *In re 47th and Belleview Partners,* 95 B.R. 117 (Bankr. W.D.Mo.1988) (guarantee of plan payments does not constitute new value because there is no certainty that guarantor will pay anything). Accordingly, the shareholders' guarantees are entitled to no weight.

### 3. *Pledge of Equity*

The Debtor has argued that the pledge of equity which would be retained by the shareholders under the Plan constitutes money or money's worth. Clinton's response is that permitting such a "contribution" would completely eviscerate the new value exception, since shareholders could always pledge their retained equity as new value. Moreover, the equity, worth $2 million as previously testified to by Clinton's appraiser, as noted below, will be worthless when the Debtor will have undoubtedly defaulted on the mortgages that will fully encumber the Hotel—precisely the time at which the creditors would receive that equity.

The Debtor's unsupported assertion that the reorganized Debtor's stock will be worthless because the debt of the reorganized Debtor will exceed the Hotel's value as fixed by this Court, flies in the face of the expert testimony adduced at the valuation hearing. At that hearing Robert Siegel, Clinton's appraiser, testified that so long as the Debtor's very own projections were feasible, the equity of the reorganized Debtor would be worth $2 million. (*See* July 9, 1993 transcript at pp. 50–51). Although Mr. Siegel was in Court and available for cross-examination, the Debtor declined to challenge this aspect of his testimony. In fact, although the affidavit of Mr. Joseph Picciolo sworn to December 16, 1993 referring to that amount of the stock value as determined by Mr. Siegel disputes such valuation, he indicated that in any event the stock would be intended to collateralize plan payments to the extent of its value. The fact remains that the retained equity does have value, and the only conclusion supported by the record is that such retained equity will be worth approximately $2 million.

The Debtor's argument is in further contradiction to the "new value" theory effected by the Supreme Court in *Ahlers* wherein the court dismissed the debtor's argument that the retained equity had no value if the debtor's assets were fully encumbered. Recent authorities have yielded similar conclusions. For example, in *In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695 (Bankr.S.D.N.Y.1993), *aff'd*, 165 B.R. 773 (S.D.N.Y.1994), the debtor and its limited partners asserted that the equity of the reorganized debtor was worthless because its property was fully mortgaged. The identical claim is made by the Debtor and the shareholders in the instant case. Citing *Ahlers*, in *One Times Square* Judge Blackshear rejected this analysis and held that the debtor had failed to satisfy the new value exception. *See also, In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D.Fla.1993) (equity interests in reorganized debtor have value even where debtor consists of single asset which is fully encumbered).

Clinton further argues that the proposed new value contributions would benefit the shareholders most directly because they would increase the value of the retained equity. *See e.g., One Times Square*, 159 B.R. at 708 (new value used to make repairs held insufficient because it would preserve and enhance the value of retained equity, reserving upside potential for shareholders and placing all risk on the secured creditor.) *See also, In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992). Notwithstanding all of the foregoing facts, this Court finds that the actual new value to be contributed by the shareholders consists only of a token cash contribution of $25,000, which is not reasonably equivalent to the value of the retained equity.

### 4. *The Proposed Contributions Are Not "Substantial"*

The Debtor argues that inasmuch as it is a small, private corporation, this Court should find that the proposed value contributions by the shareholders is "substantial" because it represents the shareholders' best effort. Courts which have considered the new value exception have done so even when the Debtor was a small, privately held corporation. Yet they have never applied that test in support of "new value." Nevertheless, the Debtor views that in light of the shareholders' prepetition contributions to the Debtor, the proposed "new value" is substantial. Essentially, the argument is a desperate plea for this Court to permit the shareholders to retain their equity interests in consideration of their prior equity contributions of capital and labor. This would

violate the absolute priority rule because it would permit the shareholders to retain equity interests "on account of" their pre-petition ownership and actions, which does not meet the requirements of section 1129(b)(2)(B)(ii).

By reason of all of the foregoing, the proposed contributions provided for by the Plan fail to satisfy the new value exception and thus the Plan cannot be confirmed.

### CONCLUSIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

2. The objections to the confirmation of the Debtor's Plan of Reorganization are sustained.

3. The confirmation of the Debtor's Plan of Reorganization is denied.

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.