## In re INVESTORS FLORIDA AGGRESSIVE GROWTH FUND, LTD., a Florida limited partnership, Debtor.

### Bankruptcy No. 93–79999.

United States Bankruptcy Court,
N.D. Florida,
Tallahassee Division.

Feb. 17, 1994.

Order Denying Debtor's Motion
For Reconsideration March 9, 1994.

Charles M. Tatelbaum, Tampa, FL, for debtor.

Paul D. Friedman, Miami, FL, for First-Bancorp.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS CAUSE was heard before the Court on confirmation of the Debtor's proposed plan of reorganization. The Court, having reviewed the submission of documents and exhibits, the testimony of witnesses, and the argument of counsel, makes the following findings of fact and conclusions of law. For the reasons stated herein, the Court denies confirmation the Debtor's proposed plan of reorganization and grants the motion of FirstBancorp Mortgage, Inc. ("FBM") for dismissal of the case.

### *BACKGROUND*

The Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code with the Middle District of Florida, Tampa Division on July 27, 1993. Shortly thereafter, the United States Trustee filed a Motion to Dismiss or Change Venue, and on Septem-

ber 2, 1993, an order was entered transferring venue to this Court. A plan of reorganization and a disclosure statement were filed by the Debtor on September 1, 1993. The disclosure statement was approved by the Court on November 10, 1993, and a hearing for confirmation of the plan was set for January 13, 1994. On October 6, 1993, FBM filed a motion seeking dismissal of the case under 11 U.S.C. § 1112(b) as a bad faith filing. At a hearing on FBM's motion to dismiss, the Court continued the matter after concluding that the motion would be appropriately considered in concert with the confirmation hearing. FBM also filed a motion seeking relief from stay or, in the alternative, adequate protection payments from the Debtor pursuant to 11 U.S.C. § 361(1). At a hearing on the motion, the Court also continued this matter pending the resolution of the confirmation and bad faith filing matters. FBM filed a formal objection to the Debtor's proposed plan of reorganization on January 6, 1994, and has voted against acceptance of the plan.

The Debtor is a Florida limited partnership formed in July 1987 for the purpose of acquiring investment grade real properties. The Debtor's principal asset consists of a 228 unit apartment complex, known as the Worthington Park Apartments, located in Tallahassee, Florida.[1] The property was constructed in 1972, and other than ongoing routine capital improvements, the property is considered to be in good condition with no significant deferred maintenance. A related company, Investors Real Estate Management, Inc., manages the daily operation of the project under a month-to-month contract for which it is entitled to compensation of 5% of the gross receipts of the project.

The Debtor purchased the apartment complex in January 1988 for $5,320,000. The Debtor subsequently obtained a non-recourse mortgage loan in the amount of $5,650,000. The loan is serviced by FBM[2], and requires monthly principal and interest payments of $54,340.61 based on a fixed interest rate of 11.125% and a 30 year amortization. The loan required a balloon payment at the end of its 5 year term. The loan is secured by a lien against the apartment complex, its rental proceeds and personal property in or associated with the project.

The Debtor's assets include the proceeds of a $100,000 life insurance policy which paid off on the death of one its general partners. None of the life insurance money has been applied to the monthly FBM mortgage loan payments or the operating expenses of the property. FBM does not have a security interest in these monies.

The apartment complex is convenient to the Florida State and Florida A & M university campuses, and as a result, has a significant number of student tenants. This tenant mix produces significantly lower occupancy rates during the summer months. Nevertheless, the property has historically enjoyed a high occupancy rate, averaging on an annualized basis in the high 80 to low 90 percent range. This range is generally consistent with the occupancy rates for similar apartment buildings in the southeast section of the Tallahassee market. In September 1992, a racial incident in which a tenant was severely beaten occurred on the property. Occupancy in the project fell more than usual in the spring of 1993 and the Debtor ceased making payments on the FBM loan after April 1993. These events precipitated efforts by the Debtor to sell the project. The Debtor's sale efforts failed[3], and the Debtor attempted to

1. The Debtor also purchased a 136 unit apartment complex in Orlando, Florida in March 1988. The Debtor was unable to refinance the "wrap-around" mortgage used to acquire that property, and was forced to transfer the property to the mortgage holder by a deed-in-lieu of foreclosure agreement in April 1993.

2. The loan was originated by Commercial Mortgage Corporation of America, Inc., and was subsequently assigned into a collateralized mortgage pool and sold to individual investors. FBM was originally engaged as the mortgage servicer for

Commercial Mortgage Corporation, and continues in that capacity for the present owner of the loan, Bankers Trust Company of California, N.A. For ease of identification, the mortgage loan is referred to as simply the FBM loan or the secured claim of FBM.

3. The Debtor hired a real estate broker on May 24, 1993 to sell the property. Three non-binding letters of intent were received by the Debtor, two for $6,000,000 and one for $6,200,000. None of the letters of intent resulted in a firm offer for the

re-negotiate the terms of the mortgage loan with FBM. However, FBM elected to exercise its remedies under state law by filing a foreclosure complaint. The Debtor then filed a petition for relief shortly before a state court hearing on FBM's motion for the appointment of a receiver in late July 1993.

The Debtor's proposed plan of reorganization, as amended, contains seven classes of creditors. The first three classes are for administrative costs and expenses, priority government claims, and other claims entitled to priority treatment, and are unimpaired under the plan. The fifth class contains the allowed general unsecured claims totally approximately $16,000 and is impaired. The plan proposes to pay the class 25% of the allowed claims on the effective date of the plan with three additional 25% payments to be made thereafter on a quarterly basis. This class has voted to accept the Debtor's proposed plan of reorganization. The sixth class contains the unsecured claims of insiders, and is impaired. The plan proposes to pay creditors in this class in full on April 1, 1997. The seventh class contains the equity interest holders, and is impaired. The plan calls for the equity interest holders to retain their interests "unimpaired", but withholds any partnership distributions until the claims of the six preceding classes have been satisfied in full.

Class 4 consists of the allowed secured claim of FBM, which is treated as a fully secured under the plan.[4] The plan proposes to pay $217,000 in cash to FBM on confirmation to reduce the principal balance of the loan, and to pay FBM 75% of the principal payments required under the original loan documents. The plan proposes to pay interest on the unpaid balance of FBM's claim equal to 1½% over the prime rate in the first year after the effective date, and 2½% over the prime rate thereafter to maturity. The plan extends the maturity of FBM's debt by 13 months to March 1, 1997, and waives any prepayment penalty for the early retirement of all or any part of the debt. Any and all accrued unpaid interest on FBM's claim as of the plan's effective date is to be capitalized to the loan's principal balance. In addition, the plan proposes to pay FBM, on an annualized basis, 75% of the project's net cash position in excess of $150,000, a figure the Debtor asserts is necessary to ensure sufficient working capital throughout the plan's life. FBM has voted to reject the Debtor's reorganization plan.

## POSITIONS OF THE PARTIES

The Debtor seeks confirmation of its proposed plan of reorganization over the rejection of FBM by use of the cramdown provisions of 11 U.S.C. § 1129(b). The Debtor asserts that it has demonstrated by a preponderance of the evidence each and every element required under § 1129(a) with the exception of subsection (a)(8) which requires all impaired classes to accept the plan. Moreover, the Debtor argues that its proposed plan complies with § 1129(b)(2)(A) with respect to FBM's claim in that the plan calls for FBM to retain its lien on the apartment complex and to receive deferred cash payments equal to the amount of its secured claim as of the effective date of the plan.

FBM argues that the Debtor has failed to demonstrate compliance with the confirmation requirements by a clear and convincing evidence. Specifically, FBM asserts that the Debtor's plan is too speculative, and therefore, fails the feasibility requirement of § 1129(a)(11). FBM additionally argues that the Debtor has artificially impaired the claims of the creditors in Class 5 so as to ensure confirmation of its plan. Absent the acceptance of the artificially impaired class, the proposed plan cannot be confirmed. Lastly, FBM argues that the Debtor's petition was filed in bad faith, and urges the Court to dismiss the case.

---

project. The Debtor rejected the broker agreement subsequent to filing its petition.

**4.** The Debtor listed FBM's claim in its schedules as fully secured and in the amount of $5,595,-129.50. FBM states that figure represents only principal, and properly stated the claim should include accrued, unpaid interest as of January 13, 1994 of $567,963.45 plus an undetermined amount for late fees, and legal fees and expenses. The Court makes no specific finding of the amount of FBM's claim, but uses $6,200,000 as the amount of the claim for discussion purposes only.

## DISCUSSION

### A) Confirmation

■ As an initial matter, the Court concludes from a review of relevant case authority that the Debtor bears the burden of proving the essential elements of confirmation by a preponderance of the evidence. In drawing this conclusion, the Court is most persuaded by the Fifth Circuit Court of Appeal's discussion in *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160 (5th Cir.1993). In *Briscoe Enterprises* the Fifth Circuit was charged with reviewing a bankruptcy court's confirmation of a single asset debtor's plan of reorganization under the Code's cramdown provisions. The Circuit Court, after analyzing several Supreme Court decisions, including *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), concluded that the clear and convincing standard was reserved for those cases where important individual liberty interests are involved. *Id.* at 1164. However, because confirmation involves only financial issues, the preponderance of the evidence standard is appropriate. *Id.* at 1165. We concur and adopt the preponderance of the evidence standard in this case.

■ Having established the appropriate evidentiary standard for confirmation, the Court finds that the Debtor is this case has failed to demonstrate the feasibility of the plan as required under § 1129(a)(11) by a preponderance of the evidence. Accordingly confirmation of the Debtor's proposed plan of reorganization must be denied.

■ The purpose of the feasibility requirement under § 1129(a)(11) is "to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex.1989) *(cite omitted)*. Only a reasonable assurance of commercial viability under the plan is required; a debtor need not demonstrate that the plan is certain to succeed. *Id.* However where the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied. *Id.*

In this case, the Debtor has prepared financial projections to support its claim that the proposed plan is feasible. These projections show negative cash flow of $136,474 and $44,842 in the plan's first two post-confirmation years. Only in the third year following confirmation does the Debtor anticipate the property to generate surplus funds. Notwithstanding the Debtor's assertions that the projection is based on conservative assumptions and the actual performance of the property can reasonably be expected exceed these figures, the Debtor has offered no credible evidence that the plan is feasible on an operational basis.[5]

■ More crucial to the Court's determination, however, is an analysis of the ultimate satisfaction of the FBM's claim under the plan by sale or refinance of the property, the veritable "pot of gold at the end of the rainbow." Plans which extensively rely on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan. *See Lakeside Global* at 506–10.

Our review of the record before us shows no evidence to support the Debtor's optimistic view that the Worthington Park Apartments can reasonably be expected to generate through a sale or refinance sufficient monies to fund the proposed plan. Indeed, a principal of the debtor's corporate general partner candidly admitted that it was unlikely that the property would sufficiently appreciate over the three year life of the plan to allow a refinance of the FBM mortgage.[6]

5. The projections show the property will cash flow FBM's mortgage as modified under the proposed plan by a factor of 1.17 in the first year following confirmation. This debt service coverage ratio climbs to 1.25x in the third post-confirmation year. The cash flow, and thus feasibility problem arises from projected capital expenditures, "workout" expenses and "syndication level" expenses which total $418,200 over the three year life of the proposed plan.

6. Simply capitalizing the project's net operating income in the third year of the plan confirms

In addition, this same witness indicated that any sale would likely require a cash buyer who would have the resources to raise 25% to 30% of the sales price in new equity as a down payment. A net sales price of roughly $6,000,000 is needed to retire the FBM claim, a figure that would require a buyer to fund a cash down payment of at least $1,500,000 to $1,800,000 in order to close the purchase. A down payment of this size eliminates many potential purchasers and therefore is a significant obstacle to the completion of the proposed plan. The difficulty of completing this type of transaction is evidenced by the fact that the Debtor received pre-petition three letters of intent expressing an interest in purchasing the property at a price that would have paid FBM's claim in full, but in each case the Debtor or the prospective purchaser was either unable or unwilling to consummate a sale. Moreover, the Debtor has not identified any potential buyer with the cash resources willing to enter such a transaction, but rather, offers its belief that the market for the property will strengthen over the next three years based on its intent to re-paint and re-name the project to lessen the impact of adverse publicity arising from the 1992 racial incident and the effects of a stable supply of this type of property due to local growth restrictions. While a proponent need not demonstrate the success of the plan with absolute certainty, more than simple optimism about future market conditions is needed to support the confirmation of a plan whose success depends on a future sale or refinance of the debtor's principal asset.

■ We also conclude that confirmation must be denied because the Debtor has artificially impaired the only accepting impaired class eligible to vote for the plan under § 1129(a)(10). Absent the approval of this "impaired" class the Debtor's plan could not be confirmed because no other eligible impaired class has voted to accept the debtor's proposed plan.

The facts of our case are remarkably similar to those presented before the Eighth Circuit in *In re Windsor on the River Associates, Ltd.,* 7 F.3d 127 (8th Cir.1993).[7] *Windsor on the River* involved the confirmation of a Chapter 11 plan of a single asset real estate limited partnership over the objection of a mortgage holder whose claim represented over 99% of the total value of all claims against the debtor's estate. In that case, as here, the debtor had made attempts to refinance or re-negotiate the existing mortgage loan on an apartment complex. Faced with a substantial balloon payment, the debtor failed to make several loan payments and then filed a petition for relief. In seeking cramdown of its proposed plan, the debtor obtained the acceptance of a class consisting of trade creditors with claims totalling roughly $13,000 and whose claims were impaired because they would have to wait 60 days after confirmation before being paid in full.

■ The *Windsor on the River* Court concluded that a debtor could not "manufacture" an impaired class at will so as to produce a confirmable plan and avoid the consequences of liquidation. *Id.* at 130–31. In short, the Eighth Circuit held a class is artificially impaired when the impairment arises solely from the discretion of the debtor. *Id.* at 132. When it appears that the only purpose for the impairment of a class is to secure at least one accepting impaired class for cramdown confirmation of a plan of reorganization and the debtor is unable to propose any plausible alternative explanation, the so-called impaired class of claims must be viewed as artificially impaired. *Id.* at 133. The remedy for this situation is to treat the artificially impaired class as unimpaired for purposes of § 1129(a)(10).

In this case, the Debtor has used its discretion to artificially impair Class 5 consist-

that the project cannot be expected to appreciate measurable in the near future. The Debtor's projection shows an NOI of $651,036 for the third year which, when capitalized at an 11% rate, yields a market value of $5,918,509. This value is near the middle of a range of values for the property discussed by the parties at the confirmation hearing.

7. The facts in our case are even less favorable in that the debtor in *Windsor on the River* proposed to inject $1,000,000 into the partnership, while the Debtor in this case proposes to make no contribution whatsoever.

ing of unsecured trade creditors by paying their claims in full in four quarterly installments over a nine month period following confirmation. This class is the only accepting "impaired" class eligible under § 1129(a)(10). The impairment of the class constitutes a nine month delay from the effective date of the plan in the payment in full of claims totalling roughly $16,000. The Debtor had in excess of $200,000 in cash at the time it filed its petition including $100,000 in unencumbered life insurance proceeds. The most recent debtor-in-possession report indicates that the Debtor had accumulated in excess of $460,000 in cash from rental receipts by the end of 1993. Moreover, the Debtor's amendment to its plan proposes to pay $217,000 to FBM on the effective date of the plan, and maintain a $150,000 cash reserve for "unexpected short-fall[s]." Thus, there is an appearance that the Debtor has the resources to pay the claims of Class 5 but has used its discretion in a manner to ensure the confirmation of its plan by cramdown.

The Debtor's explanation that the payment of the Class 5 claims over time is necessary to ensure the feasibility of the plan is unpersuasive. The Class 5 claims amount to only $16,000, or about one-third of the Debtor's monthly operating expenses for the project. The Debtor has sufficient money, including $100,000 of insurance proceeds which are not cash collateral, to immediately pay the Class 5 claims in full. In short, there is simply no credible reason to believe that the payment of these claims in full at the effective date of the plan will in any way unduly burden the Debtor or threaten the feasibility of the plan. The Court therefore finds that the Debtor's plan has artificially impaired the claims of the Class 5 claimants and that this class must be treated as if no impairment existed. Class 5 heretofore being the only accepting impaired class, the Court finds the Debtor has failed to comply with the provisions of § 1129(a)(10), and accordingly, the plan may not be confirmed.

## B) Bad Faith Filing

■ At an earlier hearing on FBM's motion to dismiss, the Court deferred ruling on the motion until after the hearing on confirmation of the plan of reorganization. The Court concluded the Debtor was entitled to one opportunity to reorganize its affairs in view of the Debtor having filed a proposed plan shortly after filing its petition. *See In re Clause Enterprises of Ft. Myers, Ltd.,* 150 B.R. 476, 479 (Bankr.M.D.Fla.1993). Having concluded that the Debtor's plan cannot be confirmed as proposed, the Court turns the focus of its analysis to whether the Debtor's petition was filed in bad faith.

The seminal case on dismissal of single asset real estate Chapter 11 cases based on a bad faith filing in this Circuit is *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988). In *Phoenix Piccadilly,* the Eleventh Circuit identified a number of factors which indicate a petition was filed in bad faith, including:

1) The debtor has only one significant asset consisting of real estate;

2) The debtor has few unsecured creditors whose claims are small in comparison to the claims of secured creditors;

3) The debtor has few employees;

4) The real property is the subject of a foreclosure action as a result of arrearage on the debt;

5) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors; and

6) The timing of the filing of the petition evidences an intent to frustrate or delay the legitimate efforts of the secured creditors to enforce their rights.

*Id.* at 1394–95.

These factors are present in the instant case. The Debtor's primary asset is an apartment complex. The claims of the non-insider unsecured creditors of roughly $16,000 pales in comparison to the secured $6,000,000 claim of FBM. The Debtor employs no employees directly, and only a few employees indirectly through related entities. The Debtor filed its petition shortly before a hearing on FBM's action to appoint a receiver, an action initiated only after the Debtor ceased making loan payments to FBM. The case represents a two party dispute inasmuch as the Debtor was unsuccessful in renegotiating more fa-

vorable terms of the mortgage loan with FBM. Moreover, the timing of the petition together with the Debtor's unsuccessful pre-petition attempts to re-negotiate with FBM leads us to conclude that the petition was filed with the intent to forestall FBM's collection rights and to unilaterally impose the mortgage terms deemed acceptable to the Debtor on an unwilling creditor. The Code is not to be viewed as an alternative to traditional refinancing by providing a vehicle for debtors to draft their own loans with existing creditors. *Windsor on the River*, 7 F.3d at 132. The Court concludes the Debtor's petition was filed in bad faith.

It is unlikely that this debtor will be able to develop a plan which will garner the acceptance of FBM, the only impaired creditor eligible under § 1129(a)(10). Without the acceptance of FBM, the Debtor is unable to confirm any plan of reorganization. Reviewing the record as a whole, the Court concludes the dismissal of the case is in the best interests of the creditors and the estate. 11 U.S.C. § 1112(b).

A separate Order will be entered in accordance with the Findings of Fact and Conclusions of Law as set forth herein.

### ORDER DENYING DEBTOR'S MOTION FOR RECONSIDERATION

This cause is before the Court on Debtor's Motion for Reconsideration of Order and Findings of Fact and Conclusions of Law Entered on February 17, 1994. The Court conducted a hearing on confirmation of the Debtor's proposed plan of reorganization on January 13, 1994, and at the conclusion of that hearing, directed the respective counsel to submit legal memoranda by January 26, 1994 and responses thereto by February 1, 1994. The Court thereafter entered its Findings of Fact and Conclusions of Law and an Order dismissing the case on February 17, 1994. The Court, having now reviewed the submissions of the parties with respect to the instant motion as well as the Findings of Fact and Conclusions of Law which are the subject of the same, finds no manifest error of fact or law, or newly discovered evidence to support the Debtor's motion. Accordingly, the motion is denied.

Motions for reconsideration of a bankruptcy court order are not specifically contemplated by the federal rules. Rather these motions are generally treated as a motion to alter or amend under *F.R.Civ.P. 59(e)* as adopted by Bankruptcy Rule 9023. *In re Oklahoma P.A.C. First Limited Partnership*, 122 B.R. 387, 394 (Bankr.D.Ariz. 1990). Only three grounds are available to support the motion: (1) manifest error of fact; (2) manifest error of law; or (3) newly discovered evidence. *Id.* A motion for reconsideration is not a vehicle to re-argue issues resolved by the court's decision or to make additional argument on matters not previously raised by counsel. *Id. See also, In re Bank of New England Corp.*, 142 B.R. 584, 587 (D.Mass.1992).

Confirmation of the Debtor's plan and dismissal of its case turned on three somewhat interrelated issues: feasibility, artificial impairment of an accepting class of creditors and bad faith in the filing of the petition. In the first instance, the Court concluded that the Debtor failed to demonstrate by a preponderance of the evidence that it would be able to generate within the three year life of the plan a sales price for its lone significant asset, an apartment complex, to produce sufficient net proceeds to satisfy the secured creditor's claim in full. The Debtor offers no newly discovered evidence to suggest that it will accomplish such a sale of the apartment complex within the requisite time frame. Notwithstanding the offer contained in the Debtor's motion to inject an additional $300,000 into the project, a post-confirmation hearing offer to amend an unconfirmed plan of reorganization is not newly discovered evidence on which a motion for reconsideration can be based. *See, In re French Quarters East, L.P.*, 148 B.R. 910 (Bankr.W.D.Mo.1992). In addition, we feel no need to quibble about what significance should be afforded the fact that the property's performance has recently begun to exceed the Debtor's plan projections. The fortunes of this case have always hinged on the Debtor's ability to satisfy the secured claim of FirstBancorp Mortgage ("FBM") within the parameters of the plan. The Court concluded the Debtor failed to demonstrate by a

preponderance of the evidence that it could satisfy FBM's claim within the plan terms, and now finds no manifest error of fact or law is evident from that conclusion.

The Court also finds that no error of fact or law relating to its conclusion that the Debtor artificially impaired the general unsecured claims of non-insiders. Our conclusion was based on the observation that the Debtor had accumulated in excess of $460,000 in rental receipts by the end of 1993. The Debtor's plan called for a distribution of $217,000 to FBM on the effective date of the plan with $150,000 to be held as a reserve account. The plan fails to address the balance of roughly $100,000 which coincides with the amount received by the Debtor as a death benefit from the passing of one of its general partners. These monies are not subject to the lien of FBM, and have not been utilized to pay the operating expenses of the partnership either pre-petition or post-petition. Thus, ample funds are available to pay the $16,000 of general unsecured claims of non-insiders in full on confirmation. The Court found that the impairment of this class by paying the claims in full over a nine month period following confirmation resulted solely from the Debtor's arbitrary manipulation of a class of claims. *See, In re Windsor on the River Associates, Ltd.,* 7 F.3d 127, 132–33 (8th Cir.1993). In the absence of the artificially impaired class, the Debtor cannot confirm a plan of reorganization because no non-insider impaired class would have approved the plan as required under § 1129(a)(10).

The Debtor's argument that it should not be penalized for having "excess" or "unanticipated" funds arising from the fact that no adequate protection payments have been made to FBM during the pendency of the case misses the point. The analysis offered in *Windsor on the River* focuses not upon the source of monies available to fund a plan of reorganization, but rather, on the debtor's motives with respect to the proposed *distribution* of funds under the proposed plan. When a class of claims is impaired under a plan for the sole purpose of securing the confirmation of a plan which the debtor views as an alternative to refinancing, the class must be viewed as unimpaired for purposes of § 1129(a)(10). *Id.*

In its review of the facts and circumstances involved in this case, the Court noted that at all times the Debtor has had, with the $100,000 life insurance proceeds, sufficient monies available to pay in full the claims of the general unsecured, non-insider creditors. That the Debtor decided not to utilize the life insurance proceeds to support its operations because FBM does not have a security interest in those funds suggests that all that is being rehabilitated in this case is the Debtor's *willingness* to pay its debts as they come due. Had no bankruptcy petition been filed in this case, the non-insider, unsecured creditors would be paid in full from the life insurance proceeds and FBM would be seeking collection of its debt through foreclosure proceedings. Thus, the petition benefits only the Debtor and its investors at the expense of the creditors. With no tangible benefit accruing to the creditors of the estate through the proposed plan and ample monies available to pay the claims of impaired class at confirmation, the Court correctly concluded that the impairment of the non-insider, unsecured class resulted solely from the Debtor's discretion in an effort to confirm a plan of reorganization.

 Lastly, the Debtor's arguments with respect to the Court's conclusion that the case should be dismissed as bad faith filing are merely a re-hashing of earlier argument before the Court. We concluded that the Debtor is unable to propose any confirmable plan of reorganization without an impaired class of claims. This conclusion alone is sufficient to warrant dismissal of the case. *See,* 11 U.S.C. § 1112(b)(5). We also concluded that the case fit the parameters of a bad faith filing as articulated in *In re Phoenix Piccadilly,* 849 F.2d 1393 (11th Cir.1988). Despite its assertion that the Court erred in this conclusion, the Debtor cites no authority for such a proposition, and instead, re-argues the factual circumstances surrounding the filing of its petition. The facts were presented before and considered by the Court in determining the applicability of *Phoenix Piccadilly* to this case. In addition, the Court deferred ruling on FBM's motion to dismiss to

allow the Debtor one opportunity to reorganize its affairs. *See, In re Clause Enterprises of Ft. Myers, Ltd.,* 150 B.R. 476 (Bankr. M.D.Fla.1993). One opportunity to reorganize means one opportunity to reorganize. The Debtor did not offer a consensual plan of reorganization and cannot confirm a plan without use of an artificially impaired class. An opportunity to reorganize does not mean an unending right to remain in Chapter 11 in order to hold creditors at bay without the ability to propose a confirmable plan within a reasonable time. *See, French Quarters,* 148 B.R. at 913. On further review, the Court concludes no error of fact or law is manifest with respect to this issue.

In summary, the Court concludes that the Debtor's motion is little more than a shallow effort to re-argue its position and to amend a plan of reorganization. Neither provide a sufficient basis to support a motion for reconsideration. There being no manifest error of law or fact or newly discovered evidence in this case, it is

ORDERED AND ADJUDGED that Debtor's Motion for Reconsideration be, and hereby is denied.