## In re NATIONAL/NORTHWAY LIMITED PARTNERSHIP, Debtor.

### No. 02–41188–JBR.

United States Bankruptcy Court, D. Massachusetts.

June 11, 2002.

---

William R. Baldiga, Brown Rudnick Berlack Israels, LLP, Boston, MA, for National/Northway Limited Partnership.

Peter Nils Baylor, Nutter, McClennan & Fish, Boston, MA, for LaSalle Bank National Association.

Richard T. King, Worcester, MA, United States Trustee.

## MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter came before the Court on the Motion of LaSalle Bank National Association for Relief from Stay Pursuant to 11 U.S.C. § 362(d)(3), Or, In the Alternative, For Dismissal of the Case Pursuant to 11 U.S.C. § 1112(b)(2) [Docket # 50] (the "Motion for Relief") and the Debtor's Statement In Support of Plan Confirmation and Response to Bank's Motion for Relief [Docket # 53]. These pleadings allege the facts and raise the same legal arguments as two additional sets of pleadings: (i) Debtor's Motion to Approve the Adequacy of the Disclosure Statement [Docket # 7] ("Disclosure Statement Motion") to which LaSalle objected,[1] and (ii) LaSalle's Motion to Extend The Time Within Which LaSalle May Elect Application of Section 1111(b)(2) [Docket # 22]

("Section 1111(b) Motion") to which the Debtor filed a limited objection.[2]

## FACTS

This is a single asset real estate Chapter 11 case that was filed by National/Northway Limited Partnership (the "Debtor") two days before the scheduled foreclosure of its property, a parcel of land improved by a building (the "Property"). Hi Tech Hose, Inc., an unrelated entity, leases the Property under a triple net lease that expires in 2010. The Property was originally part of a larger parcel that was divided into five separate lots. The Property consists of a six-acre parcel known as Lot 4. The Debtor's limited partner, National Construction Company (the "Affiliate"), which owns 99% of the Debtor, owns Lots 2, 3, 5, and 6 (the "Affiliate Lots"). LaSalle is the trustee for holders of a non-recourse note, in the current amount of approximately $3,800,000, secured by a mortgage on the Property and the Affiliate Lots. The Debtor and LaSalle agree that the value of the Property is less than $3,800,000; both agree that the value of the Property and the Affiliate Lots aggregate to more than $3,800,000. Cushman and Wakefield ("C & W"), holds a claim, unsecured as to the Debtor, in the amount

1. A hearing on the Disclosure Statement Motion was held on April 11, 2002. Since that time the Debtor has filed two amended plans and disclosure statements. None of the foregoing were served, and therefore are not properly before the Court although in its recent Motion to (A) Combine Final Hearing on the Adequacy of the Disclosure Statement with Confirmation Hearing and (B) Extend Exclusivity Periods ("Motion to Combine"), the Debtor refers to its plan "as amended". Moreover the same pleading incorrectly states that "[a]ll such objections [of LaSalle and informally by the United States Trustee to the adequacy of the disclosure statement] were resolved, consensually, before or during that

hearing. Accordingly there have been no pending objections to the Disclosure statement since April 11, 2002." Motion to Combine at ¶ 3. This statement is incorrect. By separate order the Court has denied the Disclosure Statement Motion and sustained LaSalle's objection.

2. The Court held an evidentiary hearing on the value of the collateral, including Debtor and non-debtor property, securing LaSalle's debt in connection with the Section 1111(b) Motion. The Court entered a separate decision and order on the Section 1111(b) Motion contemporaneously herewith.

of approximately $146.000; this debt is secured by a mortgage junior to LaSalle's on two of the Affiliate Lots.

When the Debtor filed its voluntary petition, it also filed a plan and disclosure statement as well as the Disclosure Statement Motion. LaSalle responded by filing its Section 1111(b) Motion and subsequently by objecting to the Disclosure Statement Motion on the ground that the plan was facially unconfirmable. The Court took the Disclosure Statement Motion under advisement and set the time for LaSalle to make an election under section 1111(b) until 15 days after determination of the value of all the collateral securing its debt.[3] The Court scheduled an evidentiary hearing on the value of LaSalle's collateral for May 14, 2002. Shortly thereafter LaSalle filed its Motion for Relief which the Court then scheduled for hearing on May 14, 2002.

By the time of the valuation hearing, the parties had reached agreement as to the value of the Property and all of the Affiliate Lots except Lot 6. By separate order the Court has determined the value of Lot 6.

## THE PARTIES' ARGUMENTS

The essence of LaSalle's Motion For Relief tracks its objection to the Disclosure Statement Motion, namely, the Debtor's plan is facially unconfirmable because the plan (i) impermissibly classifies claims, (ii) unfairly discriminates, and (iii) is not fair and equitable. Lasalle's deficiency claim is separately classified but will receive the same treatment as other unsecured claims, excluding the claims of C & W and members of the convenience class. LaSalle urges the Court to either grant it relief from stay to foreclose upon the Property or dismiss the bankruptcy.

The Debtor opposes the requested relief and acknowledges that it is attempting to preserve this asset for the beneficiaries of William Rizzo, Sr., the late founder of the Debtor and the primary owner of both the Affiliate and the Debtor's general partner.[4] It argues that there is nothing impermissible about this intent nor the classification of claims. It alleges that C & W's claim is different from other unsecured claims; it is secured by a mortgage on two Affiliate Lots that abut the Property and therefore C & W could block access to the Property

---

**3.** In the Motion to Combine the Debtor suggests that the time for LaSalle to make its election has expired. This is incorrect. First the Court's intent of its order providing for an extension to make the section 1111(b) election was that LaSalle would have 15 days after the Court valued all of LaSalle's collateral. Second this Court only has the power to extend the time to make a section 1111(b) election, not the power to shorten such time. Fed. R.Bank.P. 3014 ("An election ... may be made at any time prior to the conclusion of the hearing on the adequacy of the disclosure statement or within such later time as the court may fix.") *See also* Fed.R.Bankr.P. 9006(c)(2) ("The court may not reduce the time for taking action pursuant to Rules ... 3014....") It is disingenuous for the Debtor to assert that the hearing on the disclosure statement has been concluded when at that

very hearing and again over a month later, it filed modifications, albeit ineffective modifications, to both the plan and disclosure statement. *Cf. In re Scarsdale Realty Partners*, 232 B.R. 300, 302 (Bankr.S.D.N.Y.1999) (creditor can rescind election if original disclosure statement lacks adequate information).

**4.** In its Statement in Support of Plan Confirmation and Response to Bank's Motion for Relief, the Debtor states "[t]he Debtor's property is the most significant asset of Mr. Rizzo's estate, and this Chapter 11 case represents the culmination of efforts to preserve the value of the Debtor's property for the benefit of the Debtor's creditors and ultimately, the members of Mr. Rizzo's family who are the beneficiaries of his probate estate."

by foreclosing on its collateral.[5] The Debtor asserts that because C & W's claim has been separately classified and C & W will vote to accept the plan, the Debtor may use the so-called "cramdown" provision of 11 U.S.C. § 1129(b)[6] to obtain confirmation over the objection of LaSalle.

## RELIEF FROM STAY

■ LaSalle has moved for relief from the automatic stay pursuant to section 362(d)(3)[7] which was added by section 218(b) of the Bankruptcy Reform Act of 1994 to deal with single asset real estate cases. Pub.L. 103–394, 108 Stat. 4106, 4128 (Oct. 22, 1994). "This amendment will ensure that the automatic stay provision is not abused, while giving the debtor an opportunity to create a workable plan of reorganization." S.Rep. No. 168, 103d Cong., 1st Sess. (1993); *accord Riggs Bank, N.A. v. Planet 10, L.C. (In re Planet 10, L.C.)*, 213 B.R. 478, 480 (Bankr.E.D.Va. 1997); *NationsBank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 326 (Bankr.E.D.Va.1996); COLLIER ON BANKRUPTCY ¶ 362.07[5][b] n. 81 (15th rev. ed.1997). There is no dispute that this is a single asset real estate case[8] and therefore LaSalle asserts that it is entitled to relief from the stay if it demonstrates that the Debtor has failed to either file a plan "that has a reasonable possibility of being confirmed within a reasonable time" or commenced monthly payments to LaSalle.

Courts disagree as to whether granting relief under this section is mandatory or

5. The Debtor alleges and LaSalle does not dispute that there is no deeded right of access across the Affiliate Lots to the Property.

6. Section 1129(b)(1) provides:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Section 1129(a)(10) states:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

7. Section 362(d)(3) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period)—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

8. Section 101(51B) provides:

"single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000 . . . .

discretionary. *Compare Centofante v. CBJ Development, Inc. (In re CBJ Development, Inc.)*, 202 B.R. 467, 470 (9th Cir. BAP 1996); *In re Pensignorkay, Inc.*, 204 B.R. 676 (Bankr.E.D.Pa.1997) *LDN Corp.*, 191 B.R. 320 (relief mandatory where debtor did not meet requirements and failed to seek extension of 90–day period) *with In re Planet 10, L.C.*, 213 B.R. at 481 (applying § 362(d)(3) to chapter 7 but holding that lifting stay not mandatory; court could fashion different remedy); *Condor One v. Archway Apartments, Ltd. (In re Archway Apartments, Ltd.)*, 206 B.R. 463, 465 (Bankr.M.D.Tenn.1997) (relief mandatory but not limited to lifting stay). *See also* 3 COLLIER ON BANKRUPTCY at ¶ 362.07[5][b] ("Although technically the court may condition or modify the stay rather than terminating it, it appears that the legislative intent was to terminate the stay when the debtor neither proposes a viable plan nor makes payments to the secured party. A court should refuse to terminate the stay only when there is a strong reason for offering lesser relief.") (footnote omitted).

The plain language of section 362(d)(3), however, gives the Debtor a 90–day breathing space before the foregoing obligations become the basis for a motion for relief. The passage of 90 days is a predicate to relief under this section. In the instant case the Debtor filed for bankruptcy on February 26, 2002. Two months later LaSalle filed its Motion for Relief. Therefore the Motion for Relief to the extent that it seeks a lifting of the automatic stay was premature.

## DISMISSAL OF THE CHAPTER 11

■ LaSalle's Motion for Relief seeks the alternative remedy of dismissal of the case. A court has the discretion to dismiss a chapter 11, upon notice and hearing, "for cause" if it is in the best interest of creditors pursuant to 11 U.S.C. § 1112(b).[9] Cause, in turn, includes the "inability to effectuate a plan...." 11 U.S.C. § 1112(b)(2). Thus, while LaSalle's request to lift the stay was premature, its request for dismissal requires the Court to examine the confirmability of the plan. Just as a bankruptcy court must determine that a proposed plan is not facially unconfirmable without undertaking a full confirmation hearing when deciding a motion for relief under section 362(d)(2), *In re 499 W. Warren Street Associates, Ltd.*, 151

---

9. 11 U.S.C.A. § 1112(b) provides:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
(2) inability to effectuate a plan;
(3) unreasonable delay by the debtor that is prejudicial to creditors;
(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;
(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;
(7) inability to effectuate substantial consummation of a confirmed plan;
(8) material default by the debtor with respect to a confirmed plan;
(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or
(10) nonpayment of any fees or charges required under chapter 123 of title 28.

B.R. 307, 310 (Bankr.N.D.N.Y.1992) (citations omitted), a court should address the question of unconfirmability in analyzing a request to dismiss. *See* 11 U.S.C. § 1112(b)(2).

LaSalle's challenge to the plan's confirmability centers on the Debtor's classification of claims in the proposed plan.[10] The plan contains 8 classes:

class 1—taxes and municipal charges;

class 2—the secured claim of LaSalle;

class 3—the claim of C & W which the plan describes as the "C & W secured claim";

class 4—Lasalle's general unsecured claim;

class 5—general unsecured claims;

class 6—convenience class consisting of general unsecured claims less than or voluntarily reduced to $2,500;

class 7—Affiliate loan claims;  and

class 8—equity interests.

Classes 1 and 8 are unimpaired. The plan proposes to treat LaSalle's secured (class 2) and unsecured (class 4) claims in essentially the same manner;  the only difference is that Lasalle's class 2 claim will continue to be secured by the Property but its class 4 claim will not. LaSalle will receive a new 10 year note to be paid quarterly, with payments based upon a 25–year amortization schedule and a balloon payment at the end. The note will bear interest at the rate paid by United States Treasury 10–year notes at the time of confirmation plus 175 points or as otherwise determined by the Court. The new mortgage, for LaSalle's class 2 claim, will provide release prices so that LaSalle can be compelled to release its mortgage on individual properties constituting its collateral.

C & W (class 3) will receive $75,000, more than 50% of its claim, in cash within 60 days of the effective date. Other general unsecured creditors (class 4), except those electing to be part of the convenience class, will receive the same treatment as LaSalle's unsecured claim, namely, payment in full, plus interest at the same rate as classes 2 and 4, payable quarterly over ten years but based upon a 25–year amortization schedule with a balloon payment at the end of the period.

The convenience class (class 6) consists of all claims that not greater than $2,500 or which are reduced to an amount not greater than $2,500. Holders of convenience class claims will receive 90% of the claim-or reduced claim-amount within ten days of the effective date.

Affiliate claims (class 7), including interest at 7%, will be paid only if there is sufficient Excess Cash "after all payments on account of all Class Two and Class Three have been paid in full for such period."[11]

LaSalle asserts that the plan classification has been structured in such a way as to ensure that at least one class of non-insider impaired creditors will accept the plan. It questions the Debtor's characterization of class 6 as impaired and further argues this class is one example of the Debtor's attempt to gerrymander the classes. It alleges that the convenience class was created as a back-up in the event

---

10. As stated previously, the two amended plans are not before the Court but the analysis herein would be applicable to any plan that proposes classification substantially similar to the one currently before the Court.

11. As "Excess Cash" only contemplates reorganization expenses, it is unclear whether the plan contains typographical errors in designating which classes must be paid before class 7 or whether the Debtor intends to make quarterly payments to class 7 even if its unsecured creditors are not paid.

the C & W claim cannot be separately classified. It maintains that the C & W claim, which the Debtor concedes is unsecured as to the Debtor, was put into a separate class solely to ensure that there would be one class consisting of a friendly creditor to vote in favor of the plan. Finally LaSalle disputes classification of its deficiency claim separately from other general unsecured claims.

### The Burden of Proof

■■■ Unlike a confirmation hearing where the Debtor would bear the burden of demonstrating confirmability, here LaSalle must demonstrate objective futility attempting to confirm a plan. *In re Cadwell's Corners Partnership*, 174 B.R. 744, 759 (Bankr.N.D.Ill.1994), although in other cases courts have concluded that the burden is on the debtor, at least in the context of avoiding relief from stay, to prove a "reasonable probability of effectively reorganizing." *See e.g., In re Kent Terminal Corp.*, 166 B.R. 555, 560 (Bankr.S.D.N.Y. 1994). To the extent that the Debtor has a burden to bear, the Court agrees that the burden is judged against a "sliding scale" similar to the one employed by courts in analyzing whether a debtor has demonstrated a sufficient likelihood of a confirmed plan and thereby defeat a motion for relief.

A "sliding scale" is used to determine the extent to which the debtor must prove the possibility of an effective reorganization. *In re Ashgrove Apts. of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr.S.D.Ohio 1990). The stage of the proceeding determines the meaning of "reasonable possibility within a reasonable time" and the extent of the burden of proof on the debtor. *Id.* At a minimum the debtor must show that (1) it is proceeding to propose a plan of reorganization, (2) the proposed or contemplated plan has a realistic chance of being confirmed and (3) the proposed or contemplated plan is not patently unconfirmable. *Cadwell's Corners*, 174 B.R. at 759 (citing *In re Ashgrove*, 121 B.R. at 756).

*In re Robinson*, 2000 WL 1800604 at *7 (Bankr.N.D.Ill.2000).

### The Convenience Class

■■■ Section 1122 governs classification of claims.[12] Its express language permits the creation of a convenience class if such a class is "reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). In the instant case there are six unsecured creditors listed on Schedule F; one of those is the Affiliate whose claim is separately classified under the plan. In addition C & W, which is scheduled as a secured creditor on Schedule D, is an unsecured creditor. Unless other creditors voluntarily reduce their claims, only one creditor currently has a claim of less than $2,500,[13] the limit on the amount of a claim eligible for admission to the convenience class. Consequently there is no justification for an administrative convenience class. The Debtor's attempts to advocate for such a class on these facts,

---

**12.** Section 1122 provides:
(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

**13.** Two other unsecured claims exceed $4,000. Another claim is scheduled at over $21,000. The amount of the final scheduled unsecured claim is listed as unknown.

coupled with its counsel's acknowledgment that he did not know how the present value of payments to the convenience class compared to the present value of the payments to be made to general unsecured creditors, lend credibility to LaSalle's argument that the Debtor is attempting to gerrymander the classes.

### The Separate Classification of Unsecured Claims

The more difficult question is posed by the separate classifications of C & W's and LaSalle's unsecured claims. Except for the approval of convenience classes, section 1122 provides little guidance as to how claims are to be classified. It mandates that only "substantially similar" claims or interests may be grouped together. It does not indicate whether claims that are substantially similar must be classified together. In this circuit, however, the answer is that they must.

*Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir.1984), is the controlling case for classification of claims in this circuit.

> The general rule regarding classification is that " 'all creditors of equal rank with claims against the same property should be placed in the same class.' " *In re Los Angeles Land and Investments, Ltd.*, 282 F.Supp. 448, 453 (1968), *aff'd,* 447 F.2d 1366 (9th Cir.1971) (quoting *In re Scherk v. Newton*, 152 F.2d 747 (10th Cir.1945)). Separate classifications for unsecured creditors are only justified "where the legal character of their claims is such as to accord them a status different from other unsecured creditors...." *Id.* at 454.

*Granada Wines*, 748 F.2d at 46. Therefore if LaSalle's and C & W's unsecured claims are of the same legal character as the other unsecured claims, they must be placed in class 5. Because the Debtor contends that C & W's and Lasalle's unsecured claims are dissimilar not only from the other unsecured claims but also from each other, the Court must examine Lasalle's and C & W's claims individually.

### Lasalle's Deficiency Claim

■ Whether an undersecured creditor's deficiency claim is of a different legal character than other general unsecured claims and therefore must be separately classified has generated a divergence of views in this jurisdiction. In *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991), Judge Queenan permitted a mortgagee's deficiency claim to be classified separately from the unsecured trade creditors. The mortgagee held a non-recourse note and thus the right to elect treatment of its entire claim as secured under section 1111(b). *Id.* at 1001. To the *Bjolmes* court this right to make an election indicated a difference of the type referred to in *Granada Wines.*

> This [right to make an election] is the right to treat the entire amount of its allowed claim as a secured claim even though this amount exceeds the value of its mortgage interest. Should this election be made, the FDIC would not be entitled to share with trade creditors in other property now in the bankruptcy estate or brought into the estate through avoidance powers. The FDIC's sole recourse would then be to look to the mortgaged property. Here is the type of dichotomy referred to in *Granada Wines* —a difference in rank with respect to property.

*Id.* at 1003. The court noted that the difference was evidenced at the hearing when the mortgagee "indicated that it would vote its claim against the plan in order to strengthen its case for terminating the automatic stay." *Id.* The court

concluded that because of "heavy linkage in law and fact between the FDIC's secured and unsecured claims, its unsecured claim is that in name only." *Id.* at 1004.

Similarly in *In re Gato Realty Trust Corp.,* 183 B.R. 15, 21 (Bankr.D.Mass. 1995), Judge Boroff also determined that separate classification of a non-recourse note was permissible. Acknowledging that this is clearly the minority view, the court stated:

> This Court believes that a deficiency claim, as impacted by § 1111(b), enjoys a rank, character and status different from the withdrawal liability claim considered in *Granada Wines.* While the *Granada Wines* withdrawal liability claim was distinct from other unsecured claims only in its allowable amount, the deficiency claim subject to § 1111(b) enjoys the right to assume a different rank, status and character than other unsecured creditors against property of the estate. Namely, the deficiency claim has the right of conversion from an unsecured claim to a nonrecourse secured claim. That right is not available to other unsecured creditors. Furthermore, this Court reads in *Granada Wines* court's adoption of the terms "character" and "status" rather than "priority" (while still rejecting the business justification approach), a broader examination of the legal rights of different unsecured claims. Otherwise, that court would not have suggested that any separate classification of unsecured claims was possible under any circumstances. On the contrary, *Granada Wines* explicitly provides that based on differences in "rank", "status" and "character", there can be separate classification of unsecured claims.

In *In re Barney and Carey Company,* 170 B.R. 17 (Bankr.D.Mass.1994). Judge Feeney undertook a comparison of the First Circuit's strict approach to classification of claims with the more flexible standards articulated in other circuits. Even within those circuits permitting separate classification based upon a legitimate business justification, the majority of courts still require something more than an undersecured creditor's rights pursuant to section 1111(b). *Id.* at 22–23. Agreeing with the majority, Judge Feeney rejected the notion that the mere right to make an election under section 1111(b) was sufficient to justify separate classification of the undersecured creditor's *recourse* claim. She concluded that when a creditor does not make an election under section 1111(b)(2), there is no legal distinction between its deficiency claim and other unsecured claims. The court, however, reserved ruling on the issue presented here, namely, whether the right to make an election under section 1111(b) justifies separate classification of a deficiency claim of a *non-recourse* creditor. Does the fact that but for section 1111(b) the deficiency claim would not exist make the deficiency claim of a different "legal character"?

Judge Goodman in *In re Cantonwood Associates Ltd. Partnership,* 138 B.R. 648, 653–57 (Bankr.D.Mass.1992), answered the foregoing question in the negative. After reviewing the leading cases on classification of non-recourse deficiency claims, Judge Goodman adopted the approach set forth in *Phoenix Mutual Life Ins. v. Greystone III Joint Venture (In the Matter of Greystone III Joint Venture),* 948 F.2d 134 (5th Cir.1991), *vacated in part per curiam, reh'g en banc denied,* 1992 WL 35878· (February 27, 1992).[14] In *Grey-*

---

**14.** This citation is as of the date of the *Cantonwood* decision. The current correct citation for the case upon remand is *In the matter of*

*Greystone III Joint Venture,* 995 F.2d 1274, 1279–80 (5th Cir.1991) *cert. denied sub nom. Greystone III Joint Venture v. Phoenix Mutual*

*stone,* the Fifth Circuit announced the often-quoted commandment for classification: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Cantonwood,* 138 B.R. at 653, quoting *Greystone,* 948 F.2d at 139. The *Greystone* court rejected separate classification of a non-recourse deficiency claim arising under section 1111(b).

The bankruptcy court resorted to policy considerations because it believed that Congress did not foresee the potential impact of an electing creditor's deficiency on claim on the debtor's aspiration to cramdown a plan. We disagree with this approach for three reasons. First, it results here in violating § 1122, by gerrymandering the plan vote, for the sake of allegedly effectuating a § 1129(b) cramdown. "Policy" considerations do not justify preferring one section of the Code, much less elevating its implicit "policies" over other sections, where the statutory language draws no such distinctions. Second, as shown, it virtually eliminates the § 1111(b) election for secured creditors in this type of case. Third, the bankruptcy court's concern for the viability of the cramdown plan is overstated.... That Greystone's cramdown plan may not succeed on the facts before us does not disprove the utility of the cramdown provision. 948 F.2d at 140.

*Cantonwood,* 138 B.R. at 655.

Judge Hillman in *In re L.G. Salem Ltd. Partnership,* 140 B.R. 932, 935 (Bankr. D.Mass.1992), adopted *Cantonwood.* In *In re Cranberry Hill Associates Ltd. Partnership,* 150 B.R. 289, 290 (Bankr.D.Mass. 1993), Judge Kenner denied confirmation of a plan that separately classified a deficiency claim and expressly adopted *Cantonwood* and *Cranberry Hill Associates.*

*Life Ins. Co.,* 506 U.S. 821, 113 S.Ct. 72, 121

Other bankruptcy courts in the First Circuit have reached the same conclusion. *See, e.g., In re Main Road Properties,* 144 B.R. 217, 221 (Bankr.D.R.I.1992). This Court concludes that the decisions of Judges Goodman, Hillman, and Kenner represent the approach that the First Circuit would adopt if faced with this issue and consequently respectfully disagrees with Judges Queenan and Boroff.

The legislative history of section 1122 indicates that it was a codification of caselaw that existed under the Bankruptcy Act. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 188 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5904; H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6362. Cases under the Bankruptcy Act, including *In the Matter of Los Angeles Land and Investments, Ltd.,* cited with approval by the *Granada Wines* court, recognized that while generally "[a]ll creditors of equal rank with claims against the same property should be placed in the same class", sometimes the legal character of some claims "is such as to accord them a status different from other unsecured creditors, i.e., claims within the 'six-month rule' or tax claims." *Los Angeles Land and Investments,* 282 F.Supp. at 454. "It is well summarized in Collier on Bankruptcy, Vol. 6A, Section 9.13(1), Pg. 238, as follows: 'The fact that (unsecured) claims may take various forms—as for example, notes, accounts, written contracts, torts or the like—would not ordinarily compel separate classification since an unsecured indebtedness or liability is the common denominator of all.'" *Id.*

As the *Los Angeles Land and Investments* court articulated

The test to be applied appears to be one directed toward a determination of the

L.Ed.2d 37 (1992).

"nature" of the claim. This would encompass an analysis of the legal character or the quality of the claim as it relates to the assets of the debtor. Basically, it is simply a method of recognizing the rights of creditors which call for difference in treatment. Generally, however, "All creditors of equal rank with claims against the same property should be placed in the same class." *In re Scherk v. Newton*, C.A.10th (1945) 152 F.2d 747.

\*　　\*　　\*　　\*　　\*　　\*

The courts recognize that the word 'nature' is used in no technical sense in law but is used in its ordinary common vernacular, wherein it means kind, sort, species or character. Where the differences are in the rates of interest, in the amounts, in the dates of maturity, in names of payees, *the manner in which the claim arose* and such other minor details, they cannot affect the 'nature,' i.e., the kind of claim, otherwise a separate class would have to be provided for nearly every type of situation which would be an unthinkable calamity when the object and aim of the statute is regarded. *In re Missouri Pacific Railway Co.*, E.D.Mo. (1935) CCH Bankr. Serv. Section 3780.

*Los Angeles Land and Investments*, 282 F.Supp. at 453–54. (Emphasis added). Thus the manner in which Lasalle's deficiency claim arises is irrelevant.

In addition, to hold that the manner in which the claim arose would render a secured creditor's right to make an election meaningless; a debtor could carve the creditor out of the unsecured class and force confirmation over the creditor's objection. *In the matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279–80 (5th Cir.1991) *cert. denied sub nom. Greystone III Joint Venture v. Phoenix Mutual Life*

*Ins. Co.*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

The purpose of § 1111(b) is to provide an undersecured creditor an election with respect to the treatment of its deficiency claim. Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured claim for the entire amount of the debt. If separate classification of unsecured deficiency claims arising from non-recourse debt were permitted solely on the ground that the claim is non-recourse under state law, the right to vote in the unsecured class would be meaningless. Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor's ability to negotiate a satisfactory settlement of either its secured or unsecured claims would be seriously undercut.

*Id. See also In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 483 (2d Cir. 1994), *cert. denied sub nom. Boston Post Road Ltd. Partnership v. FDIC*, 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates, (In re Route 37 Business Park Associates)*, 987 F.2d 154, 160–61 (3d Cir. 1993); *Lumber Exchange Bldg. Limited Partnership v. Mutual Life Ins. Co. of N.Y. (In re Lumber Exchange Bldg. Limited Partnership)*, 968 F.2d 647, 649 (8th Cir.1992); *In re Bryson Properties, XVIII*, 961 F.2d 496, 501–02 (4th Cir.), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). *But see In re Woodbrook Assoc.*, 19 F.3d 312, 319 (7th Cir. 1994) (right to make § 1111(b) election requires separate classification of deficien-

cy when debtor is a single-asset partnership).

Finally, this case, like most of the cases in which classification of claims is an issue, is a single asset real estate case. Single assets real estate cases have generated a plethora of articles and published decisions as courts and commentators have attempted to grapple with a balancing of the right of the single asset real estate entity to seek the protection of bankruptcy against the rights of the secured creditor to not have his payments stretched out while the debtor hopes for an uptick in the real estate market. Prior to 1994 one common theme seemed to emerge: most single asset real estate cases did not belong in chapter 11 proceedings. *See, e.g.,* Erich J. Stegich, The National Bankruptcy Review Commission: Proposals for Single asset Real Estate, 5 Am.Bankr.Inst.L.Rev. 530, 536 and n. 18 for a collection of cases and articles dealing with this topic. *But see* Brian S. Katz, Single-asset Real Estate Cases and the Good Faith Requirement: Why Reluctance to Ask Whether a Case Belongs in Bankruptcy May Lead to The Incorrect Result, 9 Bankr.Dev.J. 77, 85 (1992) ("Though most single-asset cases are not permitted to remain in bankruptcy, courts do not reach that conclusion based on a generalized determination that the case does not properly belong in the bankruptcy forum Instead of basing their opinions on this seemingly basic question, most courts dismiss single asset cases from bankruptcy on the ground that the petition initiating the proceeding was not filed in good faith.") (footnote omitted). As a result bankruptcy courts developed several ways to deal with the single asset real estate case. While some courts expedited such cases, *Martwick v. Agribank. F.C.B. (In Re Martwick),* 60 F.3d 482 (8th Cir. 1995) and others looked for infusions of cash by equity when the income from the property was uncertain or likely to be insufficient. *In re Investors Florida Aggressive Growth Fund, Ltd.,* 168 B.R. 760 (Bankr.N.D.Fla.1994), the most common means of disposing of these cases was through the imposition of a good-faith filing requirement. *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture),* 936 F.2d 814, 816 (5th Cir.1991).

The 1994 amendments to the Bankruptcy Code clarified that Congress did not intend to deprive the single asset real estate debtor of its right to seek bankruptcy protection. Those amendments included the addition of the definition of a single asset real estate case, 11 U.S.C. § 101(51B), and as addressed previously, the special protection for secured creditors of the single asset real estate debtor, 11 U.S.C. § 362(d)(3). No other special provisions were made to address the common problem that arises, namely, how is the inherent tension between a debtor's need to get at least one non-insider class to accept the plan while avoiding classification that can only be construed as gerrymandering.

■ That Congress left section 1122 unchanged indicates that while Congress intended to clarify that single asset real estate entities can be debtors, they are to be afforded no special consideration in formulating a confirmable plan. Gerrymandering is still unacceptable, and in this circuit at least, because section 1122 remained unchanged, unsecured claims, whether trade or deficiency claims, must be classified together.

### C & W's Claim

■ The Debtor argues that because C & W holds security for its claim, albeit non-Debtor property, its claim is of a different nature and therefore it must be separately classified. To support this posi-

tion, the Debtor relies upon *In re Johnston*, 21 F.3d 323 (9th Cir.1994). In that case the court, treating the ruling by the bankruptcy court as to the similar or different nature of the claims at issue as findings of fact reviewable under a clearly erroneous standard, concluded that "the bankruptcy court did not commit clear error in finding that Steelcase was the only unsecured creditor whose claim is currently being litigated. Moreover, Steelcase, unlike other unsecured claimants, holds a partially secured interest in COS, thereby according Steelcase a different status than Class 19, Class 20, and Class 22 claimants." *Id.* at 328. The Debtor ignores that the Ninth Circuit has adopted a test less stringent than the strict approach of *Granada Wines* and permits separate classification of claims based upon the economic or business reasons advanced by a debtor. *Principal Mutual Life Insurance Company v. Baldwin Park Towne Center, Ltd (In re Baldwin Park Towne Center, Ltd.)*, 171 B.R. 374, 376 (Bankr.C.D.Cal. 1994). The strict approach of *Granada Wines* carves out no such exemptions to the general rule for classifying claims in this circuit.

Moreover, while the Debtor criticized LaSalle for ignoring *Johnston*, the Debtor ignores *In re Thornwood*, 161 B.R. 367 (Bankr.M.D.Pa.), *aff'd.*, 162 B.R. 438 (M.D.Pa.1993). In that case the court refused to separate classification of an unsecured claim which was also guaranteed by the debtor's principal. "[T]he focus of claim classification requirements should be upon the nature of the creditor's claims 'as it relates to the assets of the debtor.' *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 670 (Bankr.D.D.C.1992) (emphasis added); *see also Greystone III*, 948 F.2d at 134." *Thornwood*, 161 B.R. at 370. Moreover, even *Bjolmes*, which the Debtor urges this Court to adopt with respect to Lasalle's claim, stated that the presence of

a personal guarantee is insufficient to meet the *Granada Wines* test. *Bjolmes*, 134 B.R. at 1003. If the existence of a personal guarantee, which provides the creditor a means to collecting payment not available to other unsecured creditors, does not affect the legal nature of the guaranteed claim, the existence of another means of collecting payment, albeit in the form of a mortgage, should also not affect the legal nature of the unsecured claim. As to the Debtor's asset. C & W is unsecured.

Finally, if the Court were to accept the Debtor's argument that C & W's ability to foreclose on its collateral and thereby cut off access to the Property distinguishes C & W's claim from general unsecured claims, it fails to explain why LaSalle which, in theory, has the same ability given its senior mortgage on all the Affiliate Lots, should not have its unsecured claim placed in the same class as C & W's. That LaSalle and C & W might have different economic incentives is irrelevant to the classification analysis in this circuit.

## CONCLUSION

For the foregoing reasons, the proposed plan is facially unconfirmable, unfairly discriminates, and is not fair and equitable. The Court, however, will give the Debtor a short extension of time to correct the deficiencies. A separate order will issue.